## New Hampshire Insurance Company, Inc. *vs.* John McCann & another.[1]

Suffolk. February 1, 1999. - March 10, 1999.

Present: Wilkins, C.J., Abrams, Lynch, Greaney, Fried, & Marshall, JJ.

*Negligence,* Attorney at law. *Attorney at Law,* Malpractice. *Assignment. Public Policy. Release.*

Discussion of cases from other jurisdictions that have considered whether an assignment of a legal malpractice claim is enforceable. [206-209]

This court concluded that a legal malpractice claim may properly be voluntarily assignable in circumstances in which no clear rule of law or professional responsibility or matter of public policy would require that the assignment not be enforced. [209-210]

In the circumstances of a voluntary assignment of a legal malpractice claim for economic loss from alleged breach of contract and negligence, no reason appeared for the assignment not to be enforced [210-212], and the matter was remanded for receipt of supplemental materials and reconsideration of the defendants' motion for summary judgment [212-214].

Civil action commenced in the Superior Court Department on July 12, 1995.

The case was heard by *Richard E. Welch, III,* J., on a motion for summary judgment.

An application for leave to prosecute an interlocutory appeal was allowed by *Rudolph Kass,* J., in the Appeals Court, and the appeal was reported by him to a panel of that court. The Supreme Judicial Court granted a joint request for direct appellate review.

*Regina E. Roman (William L. Boesch* with her) for the defendants.

*Jonathan Shapiro* for the plaintiff.

*Alison Mills Cloutier & Michael Fredrickson* for Massachusetts Clients' Security Board, amicus curiae, submitted a brief.

---

[1]Madan & Madan, a law firm and professional corporation.

*Harvey Weiner & John J. O'Connor* for Twin City Fire Insurance Company, amicus curiae, submitted a brief.

GREANEY, J. We consider whether the voluntary assignment made in this case of a legal malpractice claim should be enforced. We conclude that the assignment is enforceable.

The following provides the background of the case. Norman W. and Hartley R. Cranton (Crantons) established the Haverhill Realty Trust (trust) by a declaration of trust in 1971. The Crantons were the sole trustees of the trust, and through it they owned and managed a rental apartment building at 27 Webster Street in Haverhill. The insurer for the property during the relevant period was the plaintiff, New Hampshire Insurance Company, Inc. (New Hampshire). Thomas and Deborah Langlois, and their son William, who was born in 1974, rented an apartment at 27 Webster Street from 1974 through 1978.

In 1978, Thomas Langlois, as parent and next friend of William, filed a lawsuit in the District Court against "Norman Cranton and Hartley Cranton, Trustees of Haverhill Realty Trust," alleging that they had violated the lead paint statute, G. L. c. 111, § 199, by "allow[ing] dangerous levels of lead [paint] to exist in residential premises," and by failing to remove or cover the paint. The action sought to recover damages for personal injuries which William had allegedly incurred through his contact with the lead paint. The Crantons joined New Hampshire and "Thomas E. Langlois and [Deborah] Langlois" as third-party defendants in the case. The case was settled in 1978, when New Hampshire paid $3,000 to Thomas Langlois. Thomas signed a document entitled "Parents Release and Indemnity Agreement" which released "Norman Cranton and Hartley Cranton as Trustees of Haverhill Realty Trust, their heirs, successors and assigns of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation, on account of, or in any way growing out of, any and all known and unknown personal injuries and property damage which we may now or hereafter have as the parents and/or guardian of [William], and also all claims or rights of action for damages which the said minor has or may hereafter have." The document went on specifically to release those named therein from liability from injuries incurred by William on "a claim for lead paint poisoning." It did not specifically state that the Crantons were released from individual liability. The release was prepared by Thomas's attorney who

had not included Deborah as a plaintiff in the lawsuit or had her sign the release. The attorney testified at his deposition that it was his practice at the time to bring a personal injury suit involving a minor only in the name of the minor's father; that he considered Deborah to be his client as well as Thomas; that it was also his practice to discuss the terms of the settlement "with one in her position"; and that Deborah "was anxious that the case be settled." A stipulation of dismissal was filed in the action. New Hampshire was represented in the case by the defendant, John McCann of the defendant law firm, Madan & Madan, who, it can be inferred, received and reviewed the document described above before New Hampshire paid the settlement.

In 1992, some eleven years later, Deborah Langlois, as mother and next friend of William, filed a lawsuit in the Northeast Division of the Housing Court Department against "Norman W. Cranton, Hartley R. Cranton, and G. Hartley Cranton Individually and as Trustees of the Haverhill Realty Trust," alleging, as far as pertinent here, that the defendants had "owned and/or managed" the premises at 27 Webster Street during 1976 and 1977, and had violated the lead paint statute, causing William to incur damages as a result of lead paint poisoning. Deborah was particularly seeking to hold the Crantons personally liable on the basis that the release in the District Court action had not expressly mentioned individual liability.

The Crantons once again looked to New Hampshire for their defense, and New Hampshire retained a new attorney to defend them under its insurance policy. This lawyer prepared an "Attorney Status Report" for the claims adjustor acting on behalf of New Hampshire in which he mentioned that "[t]he insured's [namely, New Hampshire's] theories include the affirmative defense of a prior release," and that "[w]e have discussed impleading [Madan & Madan] as a third party defendant." Based on the document of release and the settlement in the earlier lawsuit, the attorney filed a motion for summary judgment.

A judge in the Housing Court denied the motion for summary judgment, indicating that he was doing so "on the authority of *Cram* v. *Town of Northbridge*, 410 Mass. 800 (1991), and for the reasons stated in the plaintiffs' opposition memorandum."[2] After this decision, and consideration of the new attorney's

---

[2]*Cram* v. *Northbridge*, 410 Mass. 800, 803-804 (1991), stands for the proposition that a tortfeasor not specifically identified in a release will not be

litigation plan, New Hampshire elected to settle with Deborah by paying her $220,000 on William's behalf. As a part of the terms of the settlement, New Hampshire and the Crantons agreed to "sell, assign, and transfer to . . . William . . . any and all of our rights, claims, demands and causes of action of any kind whatsoever . . . which we have had, or may have against . . . attorney John W. McCann and the law firm of Madan & Madan . . . and any and all other person [*sic*] who acted for us and/or represented us in the [earlier] case of Langlois v. Cranton et al.," and to cooperate fully with William's attorney in the pursuit of "claims or court actions against . . . John W. McCann and/or Madan & Madan."

In 1995, this legal malpractice action was filed in the Superior Court. New Hampshire was named as the plaintiff, but, consistent with the terms of the assignment set forth above, the complaint stated that William was "the assignee of the rights [held by] New Hampshire" against the defendants. New Hampshire asserted that the release in the first lawsuit against the Crantons covered them only in their capacity as trustees, not individually, and that the defendants had committed malpractice in failing to demand and obtain a broader release. New Hampshire also claimed that the defendants' malpractice caused it to incur damages by reason of the $220,000 settlement and associated costs of defense.

The defendants, John McCann and the Madan & Madan law firm, filed a motion for summary judgment, arguing that the assignment of a legal malpractice claim is void as against public policy, and, as a result, that New Hampshire's assignment of the legal malpractice claim to William should not be enforced. In the alternative, the defendants argued that they could not be held liable for malpractice, because the release executed in connection with the settlement of the District Court case barred any further claims against the Crantons as matter of law. Deborah opposed the motion, filing with her opposition excerpts from the depositions of the Crantons and the claims adjuster who settled her Housing Court case on behalf of New Hampshire, and a memorandum from Bertrand which indicated that one of the Crantons was aware of the lead paint contamination when the Crantons rented the apartment and that Deborah's Housing Court case had a "verdict value" of $250,000. Deborah's op-

---

regarded as discharged absent extrinsic evidence that the parties who negotiated the release so intended.

position also included an affidavit from a lawyer who could qualify as an expert in the defense of insurance claims. The affidavit stated that the defendants had acted below the requisite standard of care with respect to the release given in the settlement of the District Court action.

The defendants' motion for summary judgment was denied by a judge in the Superior Court. In his memorandum of decision, the judge noted that our appellate courts had not yet addressed whether a voluntary assignment of a legal malpractice claim can be enforced. The judge, without elaboration, indicated that he was unwilling to rule "that a legal malpractice case can never be assigned as a matter of law." He then concluded that a genuine issue or issues of material fact existed as to whether the defendants had committed malpractice with respect to the scope of the release which effectuated the settlement of the District Court lawsuit against the Crantons. The defendants appealed from the order denying their motion for summary judgment to a single justice of the Appeals Court pursuant to G. L. c. 231, § 118, first par. A single justice granted them leave to pursue an interlocutory appeal. We granted a joint application for direct appellate review.

1. We have not decided whether there can be an assignment of a legal malpractice claim in circumstances like those presented here.[3] Many jurisdictions that have considered the subject in various contexts have concluded that the assignment of a legal malpractice claim should not be enforced. These courts have not differentiated between voluntary and involuntary assignments. They have based their decisions primarily on public policy considerations, such as the need to preserve the sanctity of the attorney-client relationship and to maintain the .

---

[3]We permit assignments of legal malpractice claims in cases before the clients' security board. An applicant who receives reimbursement from the board for harm caused by an attorney's defalcation may be required by the board "to execute such instruments . . . as the Board may direct, including assignments, subrogation agreements, trust agreements, and promises to cooperate with the Board in making and prosecuting claims or charges against any person." S.J.C. Rule 4:05 (4), as appearing in 422 Mass. 1301 (1996). The board, where appropriate, uses these instruments to commence a legal malpractice claim against the defalcating attorney or a third-party attorney whose negligence caused or contributed to the defalcation.

integrity of the judicial process.[4] Some of the courts have expressed fear that the voluntary assignment of malpractice claims will create commodities to be traded on the open market, thereby degrading the legal profession and potentially increasing the number of frivolous claims brought by assignees seeking to tap the "deep pockets" of attorneys and their malpractice carriers. See, e.g., *Goodley* v. *Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 397 (1976). Other courts have focused on the perceived incompatibility of the voluntary assignment of legal malpractice claims with an attorney's duty of loyalty and duty to maintain client confidentiality. See, e.g., *Picadilly, Inc.* v. *Raikos*, 582 N.E.2d 338, 342-344 (Ind. 1991). Still other courts have expressed concerns that the voluntary assignment of malpractice claims would demean and reduce the public's confidence in the legal process, by reason of a public and disreputable role

---

[4]We have examined the underlying facts in cases in the jurisdictions that have concluded that public policy concerns prohibit the enforcement of assigned malpractice claims. Ten jurisdictions have based their decisions on malpractice claims that appear to have been voluntarily assigned, and one court did not discuss the underlying facts. See *Britton* v. *Seale*, 81 F.3d 602 (5th Cir. 1996) (Texas law); *Alcman Servs. Corp.* v. *Samuel H. Bullock, P.C.*, 925 F. Supp. 252, 257-258 (D.N.J. 1996), aff'd, 124 F.3d 185 (3d Cir. 1997); *Goodley* v. *Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 397 (1976); *Roberts* v. *Holland & Hart*, 857 P.2d 492, 495-496 (Colo. Ct. App. 1993); *Brocato* v. *Prairie State Farmers Ins. Ass'n*, 166 Ill. App. 3d 986, 989 (1988); *Coffey* v. *Jefferson County Bd. of Educ.*, 756 S.W.2d 155, 157 (Ky. Ct. App. 1988); *Joos* v. *Drillock*, 127 Mich. App. 99, 105 (1983); *Wagener* v. *McDonald*, 509 N.W.2d 188, 193 (Minn. Ct. App. 1993); *Chaffee* v. *Smith*, 98 Nev. 222 (1982); *MNC Credit Corp.* v. *Sickels*, 255 Va. 314, 317-319 (1998). See also *Washington* v. *Fireman's Fund Ins. Co.*, 459 So. 2d 1148 (Fla. Dist. Ct. App. 1984) (prohibiting assignment of legal malpractice claims, no underlying facts disclosed); *Kendall* v. *Rogers*, 181 Md. 606, 613 (1943) (early case stating that attorney not liable to client's assignees).

Seven of the cases examined from the jurisdictions that have concluded that malpractice claims should not be assigned involved an involuntary assignment of a malpractice claim, typically by way of bankruptcy or foreclosure. Involuntary assignment of malpractice claims may be more likely to implicate public policy concerns. See *Continental Cas. Co.* v. *Pullman, Comley, Bradley & Reeves*, 709 F. Supp. 44, 50-51 n.7 (D. Conn. 1989), aff'd, 929 F.2d 103 (2d Cir. 1991); *Scarlett* v. *Barnes*, 121 B.R. 578, 581-583 (Bankr. W.D. Mo. 1990); *Schroeder* v. *Hudgins*, 142 Ariz. 395 (Ct. App. 1984); *Picadilly, Inc.* v. *Raikos*, 528 N.E.2d 338, 341-345 (Ind. 1991); *Bank IV Wichita* v. *Arn, Mullins, Unruh, Kuhn & Wilson*, 250 Kan. 490, 499 (1992); *Earth Science Labs., Inc.* v. *Adkins & Wondra, P.C.*, 246 Neb. 798, 802 (1994); *Can Do, Inc. Pension & Profit Sharing Plan & Successor Plans* v. *Manier, Herod, Hollabaugh & Smith*, 922 S.W.2d 865 (Tenn.), cert. denied, 519 U.S. 929 (1996).

reversal by which a plaintiff suing on an assignment would have to admit the weakness of the case underlying the malpractice claim, and argue that, but for opposing counsel's negligence in the underlying case, opposing counsel's client might have prevailed. See, e.g., *Zuniga* v. *Groce, Locke & Hebdon*, 878 S.W.2d 313, 318 (Tex. Ct. App. 1994). One court has stated that a rule allowing such assignments would make lawyers hesitant to represent insolvent, underinsured, or judgment-proof defendants, for fear that malpractice claims will be used as tender. See *Alcman Servs. Corp.* v. *Samuel H. Bullock, P.C.*, 925 F. Supp. 252, 258-259 (D.N.J. 1996), aff'd, 124 F.3d 185 (3d Cir. 1997).

Five courts have not been persuaded by these reasons, and have declined to prohibit enforcement of the assignment of legal malpractice claims.[5] The Supreme Judicial Court of Maine has stated that voluntary assignment of a legal malpractice claim to a party with an interest in the claim who has "the time, energy and resources to bring the suit" may be the most efficient way, in some instances, to realize the value of such a claim. *Thurston* v. *Continental Cas. Co.*, 567 A.2d 922, 923 (Me. 1989). The Supreme Court of Pennsylvania rejected the public policy concerns summarized above and stated: "We will not allow the concept of the attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice. Where the attorney has caused harm to his or her client, there is no relationship that remains to be protected." *Hedlund Mfg. Co.* v. *Weiser, Stapler & Spivak*, 517 Pa. 522, 526 (1988). The courts permitting assignment have typically been presented with legal malpractice claims voluntarily assigned by a corporation to a successor corporation, and have declined to make a blanket rule, choosing to approve assignments on a case-by-case basis. See *Richter* v. *Analex Corp.*, 940 F. Supp. 353, 357-358 (D.D.C. 1996) (successor corporation purchased predecessor corporation's assets and liabilities, including malpractice claims); *Hedlund Mfg. Co.* v. *Weiser, Stapler & Spivak, supra* (business acquired inventor's business, including patents and right to sue inventor's attorney

[5]See, e.g., *Richter* v. *Analex Corp.*, 940 F. Supp. 353 (D.D.C. 1996); *Thurston* v. *Continental Cas. Co.*, 567 A.2d 922 (Me. 1989); *Vitale* v. *City of New York*, 183 A.D.2d 502 (N.Y. 1992); *Collins* v. *Fitzwater*, 277 Or. 401 (1977), rev'd on other grounds, *Lancaster* v. *Royal Ins. Co.*, 302 Or. 62 (1986); *Hedlund Mfg. Co.* v. *Weiser, Stapler & Spivak*, 517 Pa. 522 (1987).

for failure to file patent properly); *Collins* v. *Fitzwater*, 277 Or. 401, 407 (1977), rev'd on other grounds, *Lancaster* v. *Royal Ins. Co.*, 302 Or. 62 (1986) (corporate director assigned legal malpractice claim against corporate attorney to purchasers of securities). The voluntary assignment that was upheld by the Supreme Judicial Court of Maine, however, involved a case with facts somewhat similar to those here. See *Thurston* v. *Continental Cas. Co.*, *supra.* In the *Thurston* case, the insured, a dissolving company, voluntarily assigned to a products liability plaintiff its legal malpractice claim against the company's lawyers and insurer as a part of its settlement of the plaintiff's claim. The malpractice claim was based on an assertion that inadequate legal representation, accompanied by misconduct on the part of the insurer, had led to a judgment against the dissolving company, far in excess of its policy limits. The Maine court viewed the malpractice claim as one solely for economic harm, see *id.* at 923, and saw no persuasive reason to bar its assignment and prevent the client from realizing the value of the claim.

We are not persuaded that every voluntary assignment of a legal malpractice claim should be barred as matter of law. We note that most claims in Massachusetts are assignable.[6] We have recognized that legal malpractice claims are not purely contractual or tortious in nature. See *Clark* v. *Rowe*, 428 Mass. 339, 341 (1998), and authorities cited. New Hampshire pleaded the malpractice action against the defendants both as a breach of contract and as negligence. It is important to note that New Hampshire's claim is not for personal injury, but for economic loss.[7] We think the claim should be assignable unless some clear rule of law or professional responsibility, or some matter

---

[6]See, e.g., *Campione* v. *Wilson*, 422 Mass. 185, 188, 192-193 (1996) (failure to obtain insurance coverage); *Aetna Cas. & Sur. Co.* v. *Continental Cas. Co.*, 413 Mass. 730, 731 (1992) (insurer's failure to pay defense costs); *Shane* v. *Winter Hill Fed. Sav. & Loan Ass'n*, 397 Mass. 479, 481 (1986) (mortgagee's rights against another mortgagee); *Larabee* v. *Potvin Lumber Co.*, 390 Mass. 636, 640 (1983), and cases cited (any tort action for injury to property interests); *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 93 n.8 (1983), and cases cited (insurer's wrongful refusal to settle claim); *Raymer* v. *Bay State Nat'l Bank*, 384 Mass. 310, 314 (1981), and cases cited (G. L. c. 93A claims); *Wilde* v. *Mahaney*, 183 Mass. 455, 460-461 (1903) (contract claims).

[7]We have held that "[a] claim for personal injury cannot be assigned . . . ." *General Exch. Ins. Corp.* v. *Driscoll*, 315 Mass. 360, 363-364 (1944), and cases cited. We have recently stated, however, that "[t]here may be reasons

of public policy, necessitates that the assignment should not be enforced.

Neither are we persuaded to deny enforcement to the assignment in this case by the public policy arguments, articulated by those courts prohibiting assignment. We see no threat, if this assignment is upheld, to the duty of loyalty or the duty of confidentiality owed by a lawyer to his or her client. It is farfetched to imagine that a lawyer will be discouraged from zealously representing a client out of fear that the client may later offer a malpractice action against the lawyer as a part of the resolution of another case.

The duty of confidentiality is also not threatened in this case. New Hampshire, an insurance company, undertook to assign its potential legal malpractice claim against the defendants, with the full awareness that it would be waiving its attorney-client privilege, which is a privilege intended to protect New Hampshire as a client. See *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 111 (1997), and cases cited. New Hampshire should have the authority to assign the claim. As a sophisticated business entity, it could assess the economic value of the claim against the possibility that the assignment could lead to disclosures that otherwise would be confidential, and make an informed decision whether one consideration outweighed the other. There is no force to the argument that New Hampshire could not have adequately comprehended the extent to which its confidences might be disclosed if the malpractice claim was pursued. New Hampshire knowingly gave up control over confidential information by making the assignment.

This case does not raise the specter of open trading of legal malpractice claims. William, the assignee, has a direct interest in the underlying claim, and New Hampshire, recognizing the potential malpractice claim, determined that the assignment provided an efficient and reasonable method of disposing of two related legal problems. We suspect that fear of "open trading" is based in part on outmoded concepts and protectionism. We "have long abandoned the view that litigation is suspect," and have recently abolished the rule against champerty, now permitting the litigation of claims financed by others in return for their receipt of a portion of the proceeds of the litigation. *Saladini* v. *Righellis*, 426 Mass. 231, 234, 235 (1997). There is nothing to

why that rule, not recently tested, should be modified." *Kippenhan* v. *Chaulk Servs., Inc.*, 428 Mass 124, 130 (1998).

show that, in those jurisdictions that permit the voluntary assignment of a malpractice claim, there has been an increase in baseless lawsuits.

We are also not persuaded that assignment of legal malpractice claims will demean public confidence in the legal profession. The defendants argue that, "where a legal malpractice claim is assigned to one's former adversary in litigation, that adversary, as the plaintiff in the malpractice action, may be required to show that he was successful in the underlying litigation not because of the strengths of his case, but because of the incompetence of opposing counsel." Thus, the defendants see the assignment as creating a distasteful role reversal which would demean and reduce the public's confidence in the legal process.

There is no logic to this argument. The fact that an attorney might be called on to defend against an assigned malpractice claim does not always mean that the attorney's former adversary will compromise the strength of his underlying claim, resulting in some sort of role reversal which diminishes public confidence in the legal profession. In this case, for example, which concerns a pretrial settlement, the merits of the underlying lead paint poisoning action are irrelevant to the issues concerning the defendants' alleged malpractice. It could be argued just as forcefully that, providing shelter for attorneys by prohibiting the voluntary assignment of malpractice claims, would actually diminish public confidence in the profession by creating the perception that the system provides attorneys with unjustified special protection. See Quinn, On the Assignment of Legal Malpractice Claims, 37 S. Tex. L. Rev. 1203, 1206 (1996); Comment, Limits on the Privity and Assignment of Legal Malpractice Claims, 59 U. Chi. L. Rev. 1533, 1551 (1992). As one court has reasoned: "Rather than helping the image of the legal profession, a rule of non-assignability would give the impression that the profession has something to hide, that the courts are taking care of their own. A more favorable image will be projected by an acknowledgement that [the legal] profession, like any other, must face its problems and answer its accusers. Vindication after a full airing of the facts is a much better result than the suspicion that would follow a suppression of the facts." Can Do, Inc. *vs.* Manier, Herold, Hollabaugh & Smith, No. 01-A-01-9404-CH00200 (Tenn. Ct. App. 1994), rev'd on other grounds, 922 S.W.2d 865, cert. denied, 519 U.S. 929 (1996).

We conclude that New Hampshire's voluntary assignment of its legal malpractice claim is valid. We do not have an assignment which opens the doors to a general market for legal malpractice claims. There is no suggestion of improper collusion between Deborah Langlois and New Hampshire in the underlying case. Although the claim arose out of a personal injury action based on the lead paint law, the assignment concerns only New Hampshire's economic loss. No other rule of law or professional responsibility has been shown to be violated. The matters of public policy and other concerns argued by the defendants have been considered, and we conclude that the arguments do not survive a realistic appraisal of their merits.

2. The defendants argue that, if the assignment is found valid, they nevertheless should have been granted summary judgment because the document of release in the District Court action, which released the Crantons as trustees, necessarily released them as individuals and extinguished all possible claims against them in any capacity for William's injuries.[8] Thus, the defendants argue, because the Crantons were fully released, they owed no duty to New Hampshire to obtain a broader release and their conduct could not have caused New Hampshire harm.

New Hampshire argues that the Crantons were both owners (as trustees) and managers (as individuals) of the Haverhill property, and that the lead paint statute imposes strict liability on them for each of these roles. New Hampshire asserts that, while the release may have relieved the Crantons from personal liability in their role as trustees, it did not expressly relieve them from personal liability in their role as managers. New Hampshire points out that, under the lead paint law, a management company hired by a trust may be held separately liable for lead paint injuries caused by its negligent management, and it concludes from this, that the Crantons should be separately liable for such injuries where they undertook the management responsibilities on their own. The judge, in denying the defendants' motion for summary judgment, ruled that there were disputed issues of material fact concerning the scope and effect of the document of release.

The defendants are correct in stating the general rule that trustees of a business trust are personally liable for torts com-

---

[8]There is no dispute that the Crantons have been released as trustees, so the controversy is over their liability as individuals.

mitted in the administration of the trust. See *First E. Bank, N.A. v. Jones*, 413 Mass. 654, 658 n.6 (1992), and cases cited. Lead paint liability arises from statute, not from common law, and the statute imposes strict liability on the "the owner of any premises" who violates its provisions. See G. L. c. 111, § 199, inserted by St. 1971, c. 1081, § 1. The term "owner" is now specifically defined as including trustees, grantors, and beneficiaries of trusts. See G. L. c. 111, § 189A, inserted by St. 1993, c. 482, § 3.

The defendants' arguments that the document of release in the first action cannot be construed any other way than to release the Crantons in all their roles relating to the Haverhill property, and that the lead paint statute does not confer several liability for each ownership role relating to a given property, have some logical force. New Hampshire's argument that the Crantons were acting in dual and separate capacities as trustees, on the one hand, and as property managers, on the other, is somewhat less persuasive. The judge did not identify what he determined to be the triable issues of fact when he denied the defendants' motion for summary judgment.

In opposition to the defendants' motion for summary judgment, New Hampshire presented an affidavit by an attorney who specializes in insurance coverage matters and insurance company defense work. In his affidavit, the attorney stated: "Based upon my review of [the trust instrument, the document of release, and the Langlois complaints] and based upon my review and understanding of the law regarding releases, realty trusts and lead paint, it is my opinion that an attorney, representing the insurer and responsible for protecting the client's rights in the context of a release in the first *Langlois* action in 1981, in the exercise of that degree of skill and care expected of the average, qualified practitioner, should have sought to include an express term in the document releasing the [Crantons] both individually and as trustees." He further expressed the opinion that the law concerning realty trusts "should have at least raised a question" as to whether a release of the Crantons as trustees would cover an action against them as individuals, and that the lead paint law should have similarly alerted an attorney to questions regarding who might be liable as an "owner," particularly in the context of a realty trust. The affidavit is written in essentially conclusory terms and does not specify what in "the law regarding releases, realty trust and lead paint," led the attorney to form his opinions.

New Hampshire argues that the document of release is unambiguous in releasing the Crantons only in their capacities as trustees. The defendants maintain that the release was meant to extinguish all claims against the Crantons in any capacity for William's alleged lead paint poisoning. There are no affidavits addressing the intent of the parties when the release was executed.

We conclude that the defendants should be permitted to renew their motion for summary judgment. Both they and New Hampshire may, if they wish, file supplemental materials in support of, and opposition to, the renewed motion. If the judge denies the renewed motion, he should identify the issue or issues that are to be tried.

3. The order denying the defendants' motion for summary judgment is vacated. There are to be further proceedings in the Superior Court consistent with this opinion.

*So ordered.*