## WALTER GURSKI *v.* JAMES ROSENBLUM ET AL.

Superior Court, Judicial District of Stamford-Norwalk
File No. CV-00 0179063S

Memorandum filed October 24, 2003

*A. Reynolds Gordon*, for the plaintiff.

*Nuzzo & Roberts*, for the defendants.

TOBIN, J. The present case arises out of a claim of legal malpractice allegedly committed by the defendants, attorney James Rosenblum (the named defendant) and the firm of Rosenblum and Filan, LLC, in connection with the defense of the plaintiff, Walter Gurski, a podiatrist, against a medical malpractice claim. That claim, brought by a former patient, Susan Lee, alleged that she suffered injuries as a consequence of the plaintiff's unskillful treatment of her feet. In the underlying case, Lee obtained a judgment against the plaintiff in the amount of $152,000 after a default was entered against him following the failure of the defendant law firm to attend a pretrial conference on his behalf.

In response to the plaintiff's complaint, the defendants filed several special defenses. The defendants' third special defense alleged that the plaintiff was not the real party in interest and that his claims against the defendants had been improperly assigned in violation of the public policy of this state.

The case was tried before a jury. After the plaintiff had completed his case, the defendants moved for a directed verdict. Included in that motion was the claim that the plaintiff's rights against the defendants were not enforceable because they had been assigned to a third party, namely, Lee. In denying that motion, the court noted that there was, as yet, no evidence of such an assignment in the case. The court also found no merit in the other grounds stated in the defendants' motion.

At the conclusion of the defendants' case, the parties agreed by stipulation that the issue of the plaintiff's third special defense, the assignability of the plaintiff's claim, not be submitted to the jury, but, instead, be reserved for decision by the court. Evidence of an assignment from the plaintiff to Lee was introduced for the consideration of this court. The stipulation also included certain facts concerning the assignment that are discussed subsequently in this memorandum of decision. The parties further agreed that no evidence concerning the assignment was to be given to the jury.

Thereafter, the jury returned a verdict in favor of the plaintiff in the amount of $220,318. The defendants have filed three motions addressed to the verdict: (1) motion for remittitur; (2) motion to set aside the verdict; and, (3) motion for judgment notwithstanding the verdict.

## MOTION FOR REMITTITUR

The motion for remittitur filed by the defendants attacked the verdict in three respects. First, the defendants claim that the damages awarded were in excess of those shown by the evidence. Second, the defendants claim that prejudgment interest should not have been awarded to the plaintiff. Third and finally, the defendants claim that the jury incorrectly calculated its award of interest.

The jury returned a verdict in the amount of $220,318, including in its award damages in the amount of $136,800 and prejudgment interest in the amount of $83,518. The verdict form reflects that the jury determined gross damages to be $177,000, despite the fact that no evidence was offered at trial of any damages suffered by the plaintiff in excess of $152,000. On the verdict form, the jury reduced gross damages by $25,000 based on the estimated costs that the plaintiff, being uninsured, would have incurred in defending the medical malpractice case. This reduction resulted in net

damages of $152,000. The jury determined, however, that the plaintiff's comparative negligence was 10 percent, resulting in final damages of $136,800. If reduction for defense costs were applied to the maximum damages of $152,000 supported by the evidence, net damages would have been $127,000, and the final award of damages would have been $114,300 (90 percent of the net damages). The court finds that the defendants' first ground for remittitur is well founded and that the damages, prior to interest, must be reduced from $136,800 to $114,300.

The only evidence of damages presented to the jury showed that the plaintiff's damages were based on a judgment rendered against him in the amount of $152,000 on December 21, 1998. The jury was instructed as to the statutory rate for postjudgment interest under General Statutes § 37-3b, which provides for interest at the rate of 10 percent per year. The defendants claim that the jury should not have been allowed to award such interest. Based on the evidence admitted for the jury's consideration, it was appropriate for the jury to consider the interest that the plaintiff owed on the judgment entered against him as an element of his damages. The defendants had the opportunity to allow the jury to consider evidence of the assignment of the plaintiff's legal malpractice claim to Lee and the impact of such assignment, if any, on the statutory interest on her judgment. The defendants chose instead to exclude such evidence from the jury's consideration. Under these circumstances, such interest was properly considered by the jury as an element of the plaintiff's damages. Accordingly, the court finds that the defendants' second claim for reduction of the verdict is without merit.

In their third claim for remittitur, the defendants assert that even if the jury was entitled to award interest as an element of damages, the interest awarded was excessive. A review of the award reflects that the inter-

est awarded was excessive in two respects. It was based on the gross amount of the judgment entered against the plaintiff without reduction for the out-of-pocket expenses he would have incurred in defending the medical malpractice case. In addition, the interest was apparently compounded by the jury on an annual basis. These calculations resulted in an award of interest in the amount of $83,518 when the maximum amount of an appropriate interest award would have been $54,644.79. The verdict must be reduced by remittitur to reflect the proper calculation of interest.

## MOTION TO SET ASIDE THE VERDICT

There are eleven separate grounds stated in the defendants' motion to set aside the verdict. These include, inter alia, the claim that the plaintiff failed to present expert testimony to prove that the defendants' breach of professional standards applicable to the legal profession was the proximate cause of the plaintiff's injuries; that the verdict was against the weight of the evidence; and, that the jury demonstrated partiality to the plaintiff. With the exception of the grounds duplicated in the motion for remittitur and the issue of the assignability of a legal malpractice claim, all of the defendants' claims are without merit. The evidence was more than sufficient for the jury to find that the defendants committed a serious breach of their professional obligations to their client, the plaintiff, when, in connection with the defense of the medical malpractice case, they wilfully failed and refused to attend a pretrial conference on his behalf. The evidence also supported the jury's finding that this legal malpractice was a proximate cause of financial harm to the plaintiff in the form of a $152,000 default judgment being entered against him.

## MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

The sole issue raised in the defendants' motion for judgment notwithstanding the verdict is the question

of the assignability of the plaintiff's legal malpractice claim. As previously stated, the same issue was raised in the defendants' motion for a directed verdict and in their motion to set aside the verdict. The issue arises out of the following facts. On May 11, 1994, the plaintiff filed a voluntary petition in bankruptcy in the United States Bankruptcy Court for the District of Connecticut. In 1995, during the pendency of that bankruptcy, the plaintiff treated Lee as a patient for both hammer and mallet toes. In late 1997, Lee brought her action in Waterbury Superior Court against the plaintiff, alleging medical malpractice in connection with her treatment. The plaintiff's medical malpractice insurance carrier retained the defendants as counsel to defend the plaintiff in that action. It was soon determined that the plaintiff's insurance did not provide coverage for Lee's claim. The insurance carrier notified both the plaintiff and the defendants of this determination.

The defendants advised the plaintiff to engage new counsel. When no new counsel appeared on behalf of the plaintiff after six months, the defendants moved to withdraw their appearance as counsel for the plaintiff. Before that motion was granted, the defendants failed to appear on behalf of the plaintiff at a scheduled pretrial conference and a default entered against the plaintiff. The defendants' motion to withdraw appearance was eventually granted. The default was never opened and, after a hearing in damages, a judgment in the amount of $152,000 entered in favor of Lee against the plaintiff on December 21, 1998.

Under bankruptcy law, Lee's judgment was considered an administrative claim and was not subject to being discharged in the pending bankruptcy proceedings. The assets of the plaintiff were insufficient to pay both Lee's judgment and to make the payments required under the plan of reorganization he had filed in the Bankruptcy Court. Negotiations between Lee and the

plaintiff resulted in a settlement agreement. Under that agreement, Lee waived any claim against the plaintiff's assets subject to the jurisdiction of the Bankruptcy Court and released the plaintiff from any personal obligation under the judgment. In return, Lee was given the following considerations: (1) the plaintiff's bankrupt estate promised to prosecute its legal malpractice claim against the defendants; (2) the estate assigned any recovery from that action to Lee and granted her a security interest in the recovery up to the amount of her judgment against the plaintiff; and, (3) special counsel would be retained by the estate on a contingent fee basis to prosecute the malpractice claim against the defendants. Any recovery in excess of counsel fees, costs and Lee's lien would remain the property of the bankrupt estate.

The settlement agreement was submitted to the Bankruptcy Court for approval on October 15, 1999, in a motion for compromise. On December 21, 1999, the Bankruptcy Court, Shiff, J., issued an order approving the settlement agreement. Thereafter, the present litigation was commenced by the plaintiff against the defendants. Before the defendants rested their case, the parties stipulated that the defendants' third special defense would not be submitted to the jury. The parties agreed that in the event of a verdict in favor of the plaintiff, the court would determine all factual and legal issues with regard to that assignment, including whether the assignment of an interest in the plaintiff's claim to Lee violated the public policy of this state.

In connection with the court's consideration of that issue, the parties stipulated that Lee had no control over the litigation and that the plaintiff had control over all aspects of the litigation, including the right to hire and discharge counsel, to accept or reject settlement offers and to approve the choice of expert witnesses. The stipulation further stated that the plaintiff did, in

fact, veto one expert witness and had extensive involvement in the case in connection with responses to discovery and consultation with counsel on medical issues. The parties agreed that following the approval of the Bankruptcy Court of the settlement agreement, Lee occupied the position of a secured creditor—her security being an interest in the plaintiff's legal malpractice claim against the defendants.

In support of their third special defense and motion to set aside the verdict, the defendants argue that the legal malpractice claim against them was unassignable and that, after assignment, the claim cannot be enforced against them. The plaintiff claims that in the absence of Connecticut precedent, this court should adopt the position of a minority of states that permit the assignment of legal malpractice claims. The plaintiff further claims that even if Connecticut would not permit the assignment of a legal malpractice claim, the assignment made to Lee was not an assignment of the malpractice claim, but, rather, only an assignment of the right to participate in any recovery against the defendants, which does not violate the public policy of this state.

## ASSIGNMENT OF LEGAL MALPRACTICE CLAIMS

The court will first address the issue of whether legal malpractice claims are assignable in this state. At common law, tort claims, as opposed to contract claims, were not generally assignable. 6 Am. Jur. 2d 186, Assignments § 60 (2001). In a majority of states, tort claims involving only property damages are freely assignable, while those involving personal injury are not. Id., p. 191. In Connecticut, it is well established that claims for personal injuries are not assignable. *Berlinski* v. *Ovellette*, 164 Conn. 482, 485, 325 A.2d 239 (1973);[1] accord *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 382, 698 A.2d 859 (1997).

[1] *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, 236 Conn. 362, 364, 672 A.2d 939 (1996), overruled the portion of *Berlinski* v. *Ovellette*, 164 Conn. 482, 494, 325 A.2d 239 (1973), that held that equitable subrogation of an

Although no Connecticut decisions address the issue, it is generally held that legal malpractice claims are essentially personal torts that may not be assigned. In an often cited California case, it was held that an attempted assignment of a legal malpractice claim was invalid. *Goodley* v. *Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 133 Cal. Rptr. 83 (1976). In that case, the defendants, who had represented the assignor in a dissolution of marriage proceeding, were negligent when, in the course of that proceeding, they gave erroneous advice to the assignor and permitted the assignor's spouse to obtain control of certain life insurance policies.

The court in *Goodley* recognized that a cause of action arising out of either the violation of a property right or an obligation on a contract could be assigned. The court held, however, that causes of action involving wrongs done to the person, or to one's reputation, or involving contracts of a purely personal nature, were not transferable. The court predicated its decision on the uniquely personal nature of legal services and the confidential attorney-client relationship. The court held that these factors required a finding that public policy considerations dictate that legal malpractice claims are not to be subject to assignment. Id., 395.

The *Goodley* court articulated its fears that the assignment of such claims could "relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who had never had a professional relationship with the attorney and to whom the attorney had never owed a legal duty, and who never had any prior connection with the assignor or his rights. The commercial

uninsured motorist's claim was invalid. It did not overrule *Berlinski*'s holding that assignments of personal injury claims are against the public policy of this state.

aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandising such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession, but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client." Id., 397.

Similarly, in *Christison* v. *Jones*, 83 Ill. App. 3d 334, 405 N.E.2d 8 (1980), an Illinois court held that a claim for legal malpractice owned by a bankrupt could not be assigned as an asset of the bankrupt estate. The court noted that "injuries resulting from legal malpractice are not personal injuries, in the strict sense of injuries to the body, feelings or character of the client. Rather, they are pecuniary injuries to intangible property interests." Id., 338. Nevertheless, the court found that the unique nature of the attorney-client relationship made the injuries suffered as the result of legal malpractice "highly personal." Citing the personal nature of the relationship and public policy considerations, the court held that the claim could not be assigned. In passing, the court noted that the bankrupt had found no fault with his attorney's services and held that it was inappropriate for an assignee, rather than the client, to decide that a malpractice action should be instituted. Id., 339.

In *Scarlett* v. *Barnes*, 121 B.R. 578 (W.D. Mo. 1990), a United States District Court acting on an appeal of

a Bankruptcy Court's order and judgment, held that Missouri law did not allow the assignment of a claim for legal malpractice. The court stated: "In light of Missouri's prohibition of the assignment of causes of action ' "or torts . . . for wrongs done to the person, the reputation, or the feelings of the injured party, and those based on contracts of a purely personal nature, such as promises of marriage," ' *State ex rel. Park Nat. Bank v. Globe Indemnity Co.*, 332 Mo. 1089, 61 S.W.2d 733, 736 (1933), it would be anomalous to treat legal malpractice claims differently. If public policy forbids the assignment of personal tort claims, it could only be a disfigured and gnarled public policy which would nevertheless permit the assignment of legal malpractice claims." *Scarlett* v. *Barnes*, supra, 583.

In addition to the public policy concerns articulated in *Goodley*, another California court identified additional reasons to hold legal malpractice claims unassignable. In *Jackson* v. *Rogers & Wells*, 210 Cal. App. 3d 336, 258 Cal. Rptr. 454 (1989), the plaintiff had obtained a judgment in a legal malpractice action brought against his former attorney. The plaintiff then sued the insurers of the defendant in the first action alleging bad faith in failing to settle the underlying action. In a settlement with the insurers, the plaintiff obtained an assignment of their rights, including a potential legal malpractice claim against counsel who had represented the insurers and their insured in the underlying action. The court found that the principles of *Goodley* were still valid despite changes in the legal profession in recent years. The court noted that the free assignability of legal malpractice actions would undermine the element of trust essential to the attorney-client relationship. The court suggested that "counsel might be discouraged from pursuing vigorous advocacy on behalf or his or her client if that advocacy might alienate the adversary, who might someday be motivated to sue the attorney for legal malpractice under

an assignment of rights. An attorney might also seek to please an employer-insurer at the expense of the insured's best interest, if the attorney fears the employer might someday turn over its malpractice cause of action to a third party." Id., 347–48. The court noted, however, that there was no indication that the insurers who assigned their malpractice claims to the plaintiff would have sued the defendant on their own behalf. Id., 348.

A number of states have allowed the assignment of legal malpractice claims generally or under certain circumstances. In *Thurston* v. *Continental Casualty Co.*, 567 A.2d 922 (Me. 1989), the misconduct of an insurance carrier and its counsel in a product liability case allegedly caused the insured manufacturer to suffer a judgment far in excess of its policy limits. The insured manufacturer was in liquidation at the time of the judgment and as part of a settlement with the judgment creditor, assigned its rights against the insurance carrier and counsel to the judgment creditor. In approving the assignment, the court stated: "We hold first that there is no reason to prohibit the assignment of a legal malpractice claim in a situation such as this. We are not here confronted with the establishment of a general market for such claims; this assignee has an intimate connection with the underlying lawsuit. Although some cases from other jurisdictions flatly prohibit the assignment of any legal malpractice claim . . . their reasoning is not persuasive. A legal malpractice claim is not for personal injury, but for economic harm. . . . The argument that legal services are personal and involve confidential attorney-client relationships does not justify preventing a client like [the insured manufacturer] from realizing the value of its malpractice claim in what may be the most efficient way possible, namely, its assignment to someone else with a clear interest in the claim who also has the time, energy and resources to

bring the suit. The Superior Court properly denied the lawyer defendants' motion to dismiss." (Citations omitted.) Id., 923. The court apparently had no difficulty with the prospect of the assignee being placed in the position of having to prove that the judgment she had attained against the manufacturer was excessive, in order to recover from the manufacturer's trial counsel.

In *New Hampshire Ins. Co.* v. *McCann*, 429 Mass. 202, 707 N.E.2d 332 (1999), the plaintiff was a liability insurer of certain residential premises. In 1978, a tenant of the premises brought a claim against the trustees of the realty trust that owned the premises on behalf of his minor son alleging injuries caused by excess levels of lead paint. The defendants were the attorneys retained by the plaintiff to represent its insureds in that litigation. The plaintiff settled the claim in return for a release of its insureds. The release was reviewed and approved by the defendants. The release, however, was deficient in several respects. While it released the insureds as trustees, it failed to release them individually. In addition, the release was not signed by the mother of the minor. In 1992, eleven years after the settlement, the mother of the minor brought suit against the insureds individually and as trustees of the realty trust alleging the same injuries to the minor caused by lead paint exposure. After a motion to dismiss the claim was denied, the plaintiff settled the claim by paying a cash sum to the minor and by assigning to him any claims that the plaintiff might have against the defendants.

Thereafter, an action was brought on behalf of the minor in the name of the plaintiff against the defendants, alleging legal malpractice in connection with the settlement of the 1978 action and the approval of the release executed at that time. Following a denial of a motion for summary judgment, the defendants were granted leave to pursue an interlocutory appeal on the

issue of whether a legal malpractice claim could be assigned under Massachusetts law. In approving the assignment, the court rejected the majority view voiding all such transfers. The court determined that under Massachusetts law, legal malpractice claims were not considered to be for personal injuries, but for economic loss. Id., 209. The court dismissed the specter of "open trading" in claims, citing a recent Massachusetts case, *Saladini* v. *Righellis*, 426 Mass 231, 234–35, 687 N.E.2d 1224 (1997), abolishing the common-law rule against champerty. *New Hampshire Ins. Co.* v. *McCann*, supra, 429 Mass. 210.

Further, the court found no merit in the defendants' argument that the assignment of a legal malpractice claim to a former adversary would create a "distasteful role reversal which would demean and reduce the public's confidence in the legal process." Id., 211. The court reasoned that the merits of the underlying 1978 action were irrelevant to the plaintiff's claim of malpractice. The court observed that denying the assignability of legal malpractice claims would provide shelter to attorneys and diminish "public confidence in the profession by creating the perception that the system provides attorneys with unjustified special protections." Id. The court expressly rejected the reasoning of *Goodley* and noted, with approval, the decision of the Supreme Judicial Court of Maine in *Thurston*. Id., 207–208.

In *Cerberus Partners* v. *Gadsby & Hannah*, 728 A.2d 1057 (R.I. 1999), the plaintiffs were financial institutions that had purchased loans given by certain lenders to a corporate borrower. The defendants were two law firms that represented the lenders in the loan transactions. The plaintiffs claimed that the defendants failed to perfect security interests in the corporate borrower's assets and that following the borrower's bankruptcy, they were unable to collect the full value of the loans they had purchased. The court found that in connection

with their purchase of the loans, the plaintiffs had acquired all of the lenders' rights in connection with the loans, including any rights to recover for legal malpractice committed by the lenders' counsel. The court considered whether the plaintiffs' assertion of legal malpractice claims against the defendants would violate Rhode Island law. The court considered the rationale of *Goodley*, as well as that of *New Hampshire Ins. Co.*, and upheld the assignment, finding no violation of public policy. Id., 1061. In a more narrow decision than *New Hampshire Ins. Co.*, the court distinguished between an assignment of a "bare legal claim for malpractice and the assignment of a claim for malpractice which is part of a general assignment in a commercial setting and transaction that encompasses a panoply of other assigned rights, duties, and obligations." Id., 1060; see also *Hedlund* v. *Weiser, Stapler & Spivak*, 517 Pa. 522, 539 A.2d 357 (1988) (court approved of assignment of legal malpractice claim for failure to make timely filing of patent application when assignment occurred in connection with sale of client's entire business).

The courts in *Cerberus Partners* and *Hedlund* found sound practical and economic reasons for sanctioning the assignment of legal malpractice claims in commercial circumstances. Given the free and active market in corporate debt and business assets, it is both expedient and practical to allow the assignment of potential legal malpractice claims against an assignor's counsel when the transfer is part of a broader transaction. Such transfers would not tend to create a marketplace where such claims would be traded as commodities, as feared by the *Goodley* court.

When the legal representation and the assignment of malpractice claims against former counsel occurs in a noncommercial setting, however, public policy issues become more readily apparent. This is particularly true when the assignment is made to a former adversary.

In *Picadilly, Inc.* v. *Raikos*, 582 N.E.2d 338 (Ind. 1991), the case arose after the plaintiff, a tavern owner, was sued for personal injuries suffered in an automobile accident allegedly caused by the plaintiff's intoxicated patron. In the underlying action, the plaintiff's counsel allegedly committed legal malpractice by allowing the issue of punitive damages to go to the jury without objection. Following the plaintiff's bankruptcy, the legal malpractice claim was transferred to the injured driver in settlement of his claim for punitive damages. A lower court held the assignment was valid under the holding of *Thurston*, but found that the defendant attorneys had successfully shown that any malpractice was not the proximate cause of the plaintiff's injuries. The Indiana Supreme Court asserted its jurisdiction in order to reverse the lower court's holding on the assignability of legal malpractice claims. The court expressed its general agreement with the holding of *Goodley* and stated its conclusion that "[a]ssignment of legal malpractice claims would weaken at least two standards that define a lawyer's duty to a client: the duty to act loyally and the duty to maintain client confidentiality.

"A. The Duty to Act Loyally

"The assignment of a legal malpractice claim is perhaps most incompatible with the attorney's duty of loyalty. An attorney's loyalty is likely to be weakened by the knowledge that a client can sell off a malpractice claim, particularly if an adversary can buy it. If an attorney is providing zealous representation to a client, the client's adversary will likely be motivated to strike back at the attorney in any permissible fashion. If an adversary can retaliate by buying up a client's malpractice action, attorneys will begin to rethink the wisdom of zealous advocacy. A legal system that discourages loyalty to the client, disserves that client. . . . If assignments were permitted, we suspect that they would

become an important bargaining chip in the negotiation of settlements—particularly for clients without a deep pocket." Id., 342–43.

After expressing additional concerns over threats to the duty to maintain client confidentiality, the court in *Picadilly, Inc.*, addressed the difficulties inherent in the trial of a legal malpractice action where the real party in interest is a former adversary. That party "must necessarily bear the burden of proving a proposition directly contrary to the proposition they successfully proved in [the underlying case]." Id., 344–45. The court believed that the change in position would be obvious to jurors and rightly diminish their regard for the law and the legal profession. Id.

Similarly, in *Brocato* v. *Prairie State Farmers Ins. Assn.*, 166 Ill. App. 3d 986, 520 N.E.2d 1200 (1988), the court found that a legal malpractice claim could not be assigned to a former adversary. See also *Joos* v. *Drillock*, 127 Mich. App. 99, 338 N.E.2d 736 (1983) (court declined to allow assignment of legal malpractice claim to former adversary).

No Connecticut courts have reported decisions concerning this issue. In *Continental Casualty Co.* v. *Pullman, Comley, Bradley & Reeves*, 709 F. Sup. 44 (D. Conn. 1989), however, the court considered the possibility of an excess insurance carrier maintaining, by way of subrogation, a legal malpractice action against defense counsel retained by the primary insurance carrier. The federal District Court, sitting in diversity, was required to determine what the law, as determined by the state's highest court, would be in such a situation. When no direct ruling of a state court is available, the court was required to "make an estimate of what the state's highest court would rule to be its law." (Internal quotation marks omitted.) Id., 46. The court reviewed the reasoning of *Goodley* and similar cases as well as

contrary holdings by courts in Pennsylvania and Oregon. In determining that neither assignment nor equitable subrogation of legal malpractice claims would be approved by the Connecticut Supreme Court, the court stated that "the Connecticut Supreme Court would align itself with the majority and find that assignments of legal malpractice claims offend public policy." Id., 50–51 n.7.

This court concludes that under Connecticut law, a legal malpractice claim is a claim for personal injury and not a claim for economic loss. Under the holding of *Berlinski*, the assignment of such a claim is in violation of the public policy of this state.

## ABSENCE OF PERSONAL RELATIONSHIP

The plaintiff urges that even if the court should find that legal malpractice claims are generally not assignable, the court should engage in an examination of the attorney-client relationship to determine whether the assignment of the malpractice claim would undermine the trust and confidence essential to that relationship. The plaintiff urges that the court should take into account the lack of a close personal relationship between the plaintiff and the defendants. It is suggested that any public policy considerations involving the attorney-client relationship are simply not present where the relationship was practically nonexistent. The plaintiff points out that Rosenblum never even met with the plaintiff or had a telephone conversation with him.

Such claims were addressed in *Moorhouse* v. *Ambassador Ins. Co.*, 147 Mich. App. 412, 383 N.W.2d 219 (1985). In a fact pattern similar to the one confronting this court, an attorney was engaged by an insurance company to defend a personal injury claim. When it was learned that coverage for the claim did not exist, the attorney permitted a default to enter against the

client. The client, who was nearly bankrupt, assigned his legal malpractice claim to the judgment creditor who then proceeded to sue the attorney. The court first declined to overrule Michigan's position generally forbidding the assignment of legal malpractice claims as set forth in *Joos*. The court next considered the plaintiff's claim that the rule should not be applied to cases where there was no close personal relationship. The court stated that "[w]e do not think the distinction is as critical as plaintiffs believe it to be. *Joos* did not hold that legal malpractice claims are nonassignable only where the attorney and client had a close personal relationship. Attorney-client relationships vary and we do not think the degree of closeness of the relationship is of paramount concern. If it were, we would be left to the impossible task of dissecting the closeness of an attorney-client relationship in evaluating the validity of every assignment of a cause of action for legal malpractice." Id., 418

The court finds the reasoning of *Moorhouse* to be persuasive and will not accept the plaintiff's invitation to make the issue of assignability of legal malpractice claims turn on the nature, duration or quality of the underlying attorney-client relationship.

## ASSIGNMENT OF PROCEEDS

Finally, the plaintiff urges that the assignment, as structured by the plaintiff and Lee, is not a prohibited assignment of the legal malpractice claim, but rather an assignment of the *proceeds* of the claim. It is claimed that the law distinguishes between a complete assignment of a claim and the assignment of an interest in the claim.

Many courts do not accept this distinction. For example, in *Karp* v. *Speizer*, 132 Ariz. 599, 647 P.2d 1197 (1982), the court addressed the issue of whether an assignment of the proceeds that may be recovered in

a personal injury action is valid. The court noted that the claim itself was not assignable under Arizona law. Id., 601. In observing that the assignees attempted to avoid the general rule by contending that only the proceeds of the claim were involved, the court pointed out that such a distinction was one that had been espoused only rarely and that it appeared that most courts had not considered it. Id. The court held that the public policy reasons and legal principles underlying the general rule prohibiting the assignment of a claim for personal injuries, such as the dangers of maintenance and champerty, are equally applicable to situations involving assignments of only the proceeds of a personal injury action. Id., 602; see also *Town & Country Bank* v. *Country Mutual Ins. Co.*, 121 Ill. App. 3d 216, 459 N.E.2d 639 (1984); *Gilmore* v. *Attebery*, 899 S.W.2d 164 (Mo. App. 1995); *Quality Chiropractic* v. *Farmers Ins. Co. of Arizona*, 132 N.M. 518, 51 P.3d 1172 (N.M. App. 2002).

Other courts have recognized the distinction and approved of the assignment of proceeds when the assignment of the underlying claim would have been held invalid. For example, in *Achrem* v. *Expressway Plaza, Ltd.*, 112 Nev. 737, 917 P.2d 447 (1996), the court held an assignment of the proceeds of a personal injury action to be valid even though an assignment of the cause of action would have been invalid. The court stated that "a meaningful legal distinction exists between assigning the right to a tort action and assigning the *proceeds* from such action." (Emphasis in original.) Id., 741; see also *Kuhns* v. *Standard Oil Co.*, 257 Or. 482, 478 P.2d 396 (1970).

Still other courts have found no distinction between an assignment of a claim and the assignment of the proceeds and yet found that different results were mandated depending on the form, not the substance, of the transfer. In *Grossman* v. *Schlosser*, 19 App. Div. 2d 893,

244 N.Y.S.2d 749 (1963), the court held that notwithstanding a statute prohibiting the transfer of a claim or demand to recover damages for personal injuries, the assignment of the proceeds of such a cause of action, prior to its settlement or adjudication, was valid and not against public policy. The court reluctantly based its decision on the 1882 case of *Williams* v. *Ingersoll*, 89 N.Y. 508, recognizing that: "the decision in *Williams* . . . established an obvious anomaly, namely: that a person cannot transfer his cause of action but may transfer its potential proceeds, thereby allowing him to do by indirection what the common law and the statute expressly forbid. The distinction made is based on form rather than substance; it is devoid of all reality; in practical effect it fosters one of the very evils which both the common law and the statute sought to avoid, namely: champerty and maintenance in personal injury actions." Id., 894.

In Connecticut, an assignment of proceeds of a personal injury action was held valid in *Kennedy* v. *Collins Law Firm*, Superior Court, judicial district of Hartford, Docket No. CV 98 0581592S (March 5, 1999) (*Fineberg, J.*). In *Kennedy*, the court found that an assignment of an interest of $38,400 in the prospective proceeds of a personal injury claim to the plaintiff's father was not a prohibited assignment of a personal injury claim. The father had sued the attorneys who had represented his daughter in the underlying personal injury action after they disbursed settlement proceeds without giving effect to his interests in the matter as assignee. The court noted that the plaintiff-assignor retained the right to prosecute the claim as well as to recover and retain for herself damages for her personal injuries in excess of her father's interest in the claim. The court, quoting from *Berlinski*, stated that " '[t]here is, of course, a crucial distinction between an enforceable interest in the proceeds of an action and the right to maintain the

action itself.' " Id. In finding the assignment before it valid, the court in *Kennedy* noted that the assignment "is limited to a stated amount of the net proceeds, if any, and on its face has nothing to do with the maintenance or control of the underlying action." Id.

The holding of the court in *Berlinski* regarding assignments of personal injury claims in Connecticut may be stated succinctly: "[T]o the extent that the [assignment agreement] purports to transfer to [the assignor] the right to prosecute and control at its own expense and by its choice of counsel the plaintiff's cause of action against the defendants for his personal injuries it is contrary to public policy and void unless the common-law public policy of the state has been changed by the General Assembly." *Berlinski* v. *Ovellette,* supra, 164 Conn. 490.

With the exception of *Kennedy,* it does not appear that any Connecticut courts have addressed the validity of assignments of proceeds of personal injury actions. Based on *Kennedy* and the holding of *Berlinski,* this court concludes that where the rights to control the litigation and to choose counsel remain with the assignor, the public policy of this state does not prohibit the assignment of the proceeds of an action, even though public policy would prohibit the assignment of the underlying action itself. As the parties to the present case have stipulated that the plaintiff retained such control, it follows that the assignment of a portion of the proceeds to Lee was valid.

Judgment will enter for the plaintiff, subject however, to acceptance of the remittitur ordered herein.