916 So.2d 934 (2005)
SECURITY NATIONAL SERVICING CORP., Appellant,
v.
LAW OFFICE OF DAVID J. STERN, P.A., Appellee.
No. 4D04-776.
District Court of Appeal of Florida, Fourth District.
November 30, 2005.
Rehearing Denied January 20, 2006.
Nancy W. Gregoire of Bunnell, Woulfe, Kirschbaum, Keller, McIntyre & Gregoire, P.A., Fort Lauderdale, for appellant.
*936 Forrest G. McSurdy of Stern & McSurdy, P.A., Plantation, for appellee.
*935 TAYLOR, J.
Security National Servicing Corp. (Security National) appeals a summary judgment entered against it on its legal malpractice action against the Law Offices of David J. Stern, P.A. (Stern). This legal malpractice action arises out of a botched mortgage foreclosure. Security National is the transferee of the underlying note and mortgage. Because the malpractice action was transferred incident to the transfer of the note and mortgage, the trial court incorrectly found that this malpractice action was non-assignable.
This case concerns a note and mortgage in a face amount of $108,000. In 1997, the holder of the note and mortgage, UMLIC-SIX CORP., timely filed a mortgage foreclosure action. While that action was pending, UMLIC-SIX assigned the loan to EMC Mortgage. EMC hired Stern to foreclose the loan. Stern filed a second foreclosure action on the same note and mortgage on December 15, 1998. By this time, the statute of limitations had already expired, so that this 1998 foreclosure action was untimely.
On February 19, 1999, Stern substituted as counsel in the timely 1997 foreclosure suit, then five days later voluntarily dismissed that timely action, leaving only the untimely action intact. Stern essentially admits that this was malpractice.
On August 27, 1999, EMC assigned the loan to Universal Portfolio Buyers, Inc. (Universal). Stern continued on as Universal's counsel in the untimely 1998 action. On October 15, 1999, Universal assigned the loan to North American Mortgage Co. (North American). Stern remained as North American's counsel in the 1998 action.
On July 24, 2000, the owner of the encumbered property moved for summary judgment on statute of limitations grounds. On November 5, 2000, the trial court entered summary judgment for the defendant. North American appealed.
On April 30, 2001, while the appeal was pending, North American assigned the loan to Security National. The record does not reflect whether there was consideration for this transfer or whether Security National had knowledge of the status of the foreclosure at the time. Thereafter, Stern remained as counsel representing Security National, but only for a month or two.
On December 7, 2001, the second district affirmed the final judgment. Universal Portfolio Buyers, II v. Islands Int'l. Realty, Inc., 806 So.2d 479 (Fla. 2nd DCA 2001). Security National then brought this legal malpractice action against Stern. The complaint alleges negligence in dismissing the timely 1997 action (at the time EMC owned the loan) and in failing to timely move to reinstate the 1997 action until after the motion for summary judgment was filed (potentially spanning the ownership of EMC, Universal, and North American).
Although the trial court stated in her order that she "may take issue with the fairness of such ruling," she felt bound to enter summary judgment on Stern's behalf because there was no attorney-client relationship between Stern and Security National "at the time the cause of action accrued."
The standard of review of a summary judgment is de novo. Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). A legal malpractice action has three elements: 1) the attorney's employment; 2) the attorney's neglect of a reasonable duty; and 3) the attorney's negligence as the proximate *937 cause of loss to the client. See Kates v. Robinson, 786 So.2d 61, 64 (Fla. 4th DCA 2001). For statute of limitations purposes, a cause of action for legal malpractice does not accrue until the underlying adverse judgment becomes final, including exhaustion of appellate rights. See Silvestrone v. Edell, 721 So.2d 1173, 1175 n. 2 (Fla.1998). That is the first point at which there is a redressable harm. Id. at 1175. Until then, a malpractice claim is "hypothetical" and damages are "speculative." Id.; see also Hold v. Manzini, 736 So.2d 138, 142 (Fla. 3d DCA 1999) ("mere knowledge of possible malpractice is not dispositive of when a malpractice action accrues"). Security National points to this law and argues that because it owned the loan by the time the appeal was completed and the cause of action accrued, the law regarding the assignment of legal malpractice claims is irrelevant. Simply put, it claims that it was the owner of the loan at the critical point in time.
By contrast, Stern points to language from our decision in Kates, 786 So.2d at 64:
In stating a claim for legal malpractice, it is not sufficient merely to assert an attorney-client relationship. The plaintiff must also allege that a relationship existed between the parties with respect to the acts or omissions upon which the malpractice claim is based.
See also Maillard v. Dowdell, 528 So.2d 512 (Fla. 3d DCA 1988). These cases rejected attempts by former clients to retroactively expand the scope of the attorney's representation. While they are factually different, the basic point seems sound: the time of the alleged negligent act or omission is the critical point for testing the scope and existence of the attorney-client relationship. Thus, we must examine the law on assignment of legal malpractice actions, as it appears that it is only by assignment of the immature claim that Security National's rights arose.
The majority view in this country is that legal malpractice actions are not assignable. See Cowan Liebowitz & Latman, P.C. v. Kaplan, 902 So.2d 755, 759 n. 3 (Fla.2005) (counting eighteen states adhering to the majority view and seven to the minority view). The minority jurisdictions generally look at the validity of malpractice assignments on a case by case basis in light of the relevant policy considerations. See Delaware CWC Liquidation Corp. v. Martin, 213 W.Va. 617, 584 S.E.2d 473, 479 (2003) (surveying law and characterizing minority view); Gregory v. Lovlien, 174 Or.App. 483, 26 P.3d 180, 184 (2001) (same).
In Kaplan, the court first explained that the main concern with permitting assignment is that a "market for legal malpractice claims" might be created. The court continued by quoting from the seminal California case in this area:
It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty.... The commercial aspect of assignability of ... legal malpractice [actions] is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which *938 would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.
Kaplan, 902 So.2d at 760 (quoting Goodley v. Wank & Wank, Inc., 62 Cal.App.3d 389, 133 Cal.Rptr. 83, 87 (1976)).
The relevant policy concerns are more readily apparent when the legal representation and assignment occur in a non-commercial setting, particularly when the assignment is made to a former adversary. Gurski v. Rosenblum, 48 Conn.Supp. 226, 838 A.2d 1090, 1098 (2003). This latter situation, where a largely judgment-proof defendant assigns the right to sue his attorney to the successful plaintiff in exchange for a release, is generally recognized as the worst excess to be avoided. See Kevin Pennell, Note, On the Assignment of Legal Malpractice Claims: A Contractual Solution to a Contractual Problem, 82 Tex. L.Rev. 481, 496-501 (2003).
Because bringing a malpractice action necessarily works a limited waiver of the attorney-client privilege to allow defending the claim, an assignment causes the client to lose control over that waiver. On Kaplan's unique facts, the court focused almost exclusively on the absence of that underlying policy concern. In Kaplan there was no attorney-client privilege, because the attorney's employment was for the purpose of creating private placement memoranda which involved public information not covered by the privilege. It appears from Kaplan that because the "privilege" policy rationale did not apply on those facts, that was enough in itself to allow the assigned claim to go forward. However, the Kaplan court also noted that the claim did not involve "personal services."
This case likewise does not involve personal services. It also seems highly unlikely that EMC or North American shared privileged information with Stern. In Cerberus Partners, L.P. v. Gadsby & Hannah, 728 A.2d 1057 (R.I.1999), the court briefly addressed the attorney-client privilege argument which took center stage in Kaplan, sensibly stating that on the commercial facts presented there, the assignment of the loans was a waiver of the attorney-client privilege. Id. at 1060. In New Hampshire Insurance Co. v. McCann, 429 Mass. 202, 707 N.E.2d 332, 337 (1999), the court similarly pointed out that the insurance company assignor in that case was a sophisticated business that:
... could assess the economic value of the claim against the possibility that the assignment could lead to disclosures that otherwise would be confidential, and make an informed decision whether one consideration outweighed the other.
Id.
Regardless, protecting the attorney-client privilege is not the main policy ground underlying the general anti-assignment rule. The main concern is the creation of a market for legal malpractice claims. Kaplan, 902 So.2d at 760. As discussed below, it is that main concern which is absent from the current facts. The significance of Kaplan is not a narrow point pertaining to the attorney-client privilege, but rather the more broad view that *939 the door is now open to assignment of legal malpractice actions in exceptional cases which do not fully implicate the core policy concerns underlying the general rule. See id. at 761 (cautioning that general policy concerns would still prevent the assignment of "most" legal malpractice claims).
The Cerberus case from the Rhode Island Supreme Court is factually similar to this case. After the creditors of SLM International, Inc. commenced bankruptcy proceedings against it, some of SLM's lenders began selling their SLM loans, "including all of their rights and obligations connected with those loans," to other financial institutions. Those buyers then instituted suit against the original lenders' attorneys for failing to perfect the security interest in the loans so that they received less than full value for them. The Rhode Island Supreme Court stated:
We conclude that on the specific factual circumstances present in this case, where an assignee of a commercial loan agreement brings a legal malpractice action against the attorney who represented the original lender in the commercial loan transaction, the assignment of that negligence claim, if arising from the assigned commercial loan agreement, is not prohibited by Rhode Island law.
Cerberus, 728 A.2d at 1059. The court distinguished between mere purchase of a legal malpractice claim and assignment of the lender's original agreements with respect to the loans, as the assignee in that latter case acquired "all of the attendant obligations and rights that went along with those loans." Id. The court stated, "Thus, we are not dealing here with a situation where a legal malpractice claim was transferred to a person without any other rights or obligations being transferred along with it." Id.
Attempting to distinguish Cerberus, Stern argues that the loans which Security National bought were almost worthless when purchased (except for their malpractice claim potential) and that only a reversal from the second district could have breathed life back into them. However, unless the argument which Stern raised to the second district was frivolous, then clearly the loans did have some value at that point, making the distinction from the Cerberus loans more a question of degree than of substance.
In Gurski, 838 A.2d at 1098, the Connecticut court applauded the Cerberus holding, stating:
Given the free and active market in corporate debt and business assets, it is both expedient and practical to allow the assignment of potential legal malpractice claims against an assignor's counsel when the transfer is part of a broader transaction. Such transfers would not tend to create a marketplace where such claims would be traded as commodities as feared by the Goodley court.
The absence of the main policy concern underlying the general rule distinguishes this case from those involving "most" assignments. Thus, we conclude that this assignment was permissible under Kaplan. See also Richter v. Analex Corp., 940 F.Supp. 353 (D.D.C.1996) (purchaser of corporate assets could sue for malpractice); but see Earth Sci. Labs., Inc. v. Adkins & Wondra, P.C., 246 Neb. 798, 523 N.W.2d 254 (1994).
Accordingly, we reverse the summary judgment and remand with instructions to the trial court to reinstate appellant's legal malpractice claim against appellee.
Reversed and Remanded.
STEVENSON, C.J., and HAZOURI, J., concur.