969 So.2d 962 (2007)
LAW OFFICE OF DAVID J. STERN, P.A., Petitioner,
v.
SECURITY NATIONAL SERVICING CORPORATION, Respondent.
No. SC06-361.
Supreme Court of Florida.
July 5, 2007.
Rehearing Denied December 3, 2007.
*964 Robert M. Klein, Gregory S. Glasser, and Cayla B. Tenenbaum of Stephens, Lynn, Klein, et al., Miami, FL, for Petitioners.
Nancy W. Gregoire of Bunnell, Woulfe, Kirschbaum, Keller, McIntyre, Gregoire, and Klein, P.A., Fort Lauderdale, FL, for Respondents.
BELL, J.
Law Office of David J. Stern, P.A. (Stern) seeks review of the Fourth District Court of Appeal's decision in Security National Servicing Corp. v. Law Office of David J. Stern, P.A., 916 So.2d 934 (Fla. 4th DCA 2005), on the ground that it expressly and directly conflicts with three decisions of this Court, Cowan Liebowitz & Latman, P.C. v. Kaplan, 902 So.2d 755 (Fla.2005), KPMG Peat Marwick v. National Union Fire Insurance Co. of Pittsburgh, Pa., 765 So.2d 36 (Fla.2000), and Forgione v. Dennis Pirtle Agency, Inc., 701 So.2d 557 (Fla.1997). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
This case involves a legal malpractice claim arising out of an attempted mortgage foreclosure. Briefly, Security National alleges that Stern committed legal malpractice by filing an untimely foreclosure action and by voluntarily dismissing a previously filed, timely foreclosure action on the same mortgage. This blunder apparently occurred because Stern, having realized its error in filing the untimely action, intended to dismiss it but instead dismissed the timely foreclosure action by mistake. Stern continued to prosecute the untimely foreclosure action, and the trial court entered summary judgment against it. Meanwhile, the mortgage and note were assigned several times before Security National finally acquired them during the appeal in the foreclosure action. Security National retained Stern as counsel to represent its interests in the appeal. Ultimately, the Second District affirmed the trial court's decision on appeal.
Subsequently, Security National brought a legal malpractice action against Stern, claiming to have standing either (1) by virtue of its attorney-client relationship with Stern or (2) as the assignee of the mortgage and note involved in the underlying foreclosure action. The trial court entered summary judgment against Security National, but the Fourth District reversed. The Fourth District held that Security National has standing to sue Stern as the assignee of the mortgage and note. See Stern, 916 So.2d at 939.
Now Stern seeks review by this Court of the Fourth District's decision. For the reasons stated, we conclude that Security National lacks standing to sue Stern for legal malpractice either by attorney-client relationship or by assignment. Therefore, we quash the decision below.

FACTUAL AND PROCEDURAL BACKGROUND
The Fourth District described the facts of this case as follows:
This legal malpractice action arises out of a botched mortgage foreclosure. Security *965 National is the transferee of the underlying note and mortgage. . . .
. . . In 1997, the holder of the note and mortgage, UMLIC-SIX CORP., timely filed a mortgage foreclosure action. While that action was pending, UMLIC-SIX assigned the loan to EMC Mortgage. EMC hired Stern to foreclose the loan. Stern filed a second foreclosure action on the same note and mortgage on December 15, 1998. By this time, the statute of limitations had already expired, so that this 1998 foreclosure action was untimely.
On February 19, 1999, Stern substituted as counsel in the timely 1997 foreclosure suit, then five days later voluntarily dismissed that timely action, leaving only the untimely action intact. Stern essentially admits that this was malpractice.
On August 27, 1999, EMC assigned the loan to Universal Portfolio Buyers, Inc. (Universal). Stern continued on as Universal's counsel in the untimely 1998 action. On October 15, 1999, Universal assigned the loan to North American Mortgage Co. (North American). Stern remained as North American's counsel in the 1998 action.
On July 24, 2000, the owner of the encumbered property moved for summary judgment on statute of limitations grounds. On November 5, 2000, the trial court entered summary judgment for the defendant. North American appealed.
On April 30, 2001, while the appeal was pending, North American assigned the loan to Security National. The record does not reflect whether there was consideration for this transfer or whether Security National had knowledge of the status of the foreclosure at the time. Thereafter, Stern remained as counsel representing Security National, but only for a month or two.
On December 7, 2001, the second district affirmed the final judgment. [On November 5, 2002,] Security National . . . brought this legal malpractice action against Stern. The complaint alleges negligence in dismissing the timely 1997 action (at the time EMC owned the loan) and in failing to timely move to reinstate the 1997 action until after the motion for summary judgment was filed (potentially spanning the ownership of EMC, Universal, and North American).
Although the trial court stated in her order that she "may take issue with the fairness of such ruling," she felt bound to enter summary judgment on Stern's behalf because there was no attorney-client relationship between Stern and Security National "at the time the cause of action accrued."
Stern, 916 So.2d at 936 (citation omitted). On appeal, the Fourth District reversed, holding that under this Court's decision in Kaplan, Security National received a valid assignment of the legal malpractice claim against Stern. The Fourth District reasoned that "the malpractice action was transferred incident to the transfer of the note and mortgage," Stern, 916 So.2d at 936, and that the assignment in question did not implicate relevant policy concerns against legal malpractice assignments. See id. at 938-39.
On February 16, 2006, Stern filed a notice to invoke this Court's discretionary jurisdiction. Stern claims that the Fourth District misapplied and improperly extended our holding in Kaplan, which was expressly limited to the particular facts of that case. Stern argues that Security National does not have standing either (1) by its attorney-client relationship with Stern or (2) by an implied general assignment of the malpractice claim. We address both of *966 these issues in turn. As stated earlier, we ultimately determine that Security National does not have standing to sue Stern for the legal malpractice it alleges.

STANDING BY ATTORNEY-CLIENT RELATIONSHIP
The Fourth District properly concluded that Security National's attorney-client relationship with Stern did not give it standing to bring a legal malpractice action based upon acts that occurred during Stern's representation of a prior holder of the note and mortgage. As the Fourth District explained:
A legal malpractice action has three elements: 1) the attorney's employment; 2) the attorney's neglect of a reasonable duty; and 3) the attorney's negligence as the proximate cause of loss to the client. See Kates v. Robinson, 786 So.2d 61, 64 (Fla. 4th DCA 2001). For statute of limitations purposes, a cause of action for legal malpractice does not accrue until the underlying adverse judgment becomes final, including exhaustion of appellate rights. See Silvestrone v. Edell, 721 So.2d 1173, 1175 n. 2 (Fla. 1998). That is the first point at which there is a redressable harm. Id. at 1175. Until then, a malpractice claim is "hypothetical" and damages are "speculative." Id.; see also Hold v. Manzini, 736 So.2d 138, 142 (Fla. 3d DCA 1999) ("mere knowledge of possible malpractice is not dispositive of when a malpractice action accrues"). Security National points to this law and argues that because it owned the loan by the time the appeal was completed and the cause of action accrued, the law regarding the assignment of legal malpractice claims is irrelevant. Simply put, it claims that it was the owner of the loan at the critical point in time.
By contrast, Stern points to language from our decision in Kates, 786 So.2d at 64:
In stating a claim for legal malpractice, it is not sufficient merely to assert an attorney-client relationship. The plaintiff must also allege that a relationship existed between the parties with respect to the acts or omissions upon which the malpractice claim is based.

See also Maillard v. Dowdell, 528 So.2d 512 (Fla. 3d DCA 1988). These cases rejected attempts by former clients to retroactively expand the scope of the attorney's representation. While they are factually different, the basic point seems sound: the time of the alleged negligent act or omission is the critical point for testing the scope and existence of the attorney-client relationship.
Stern, 916 So.2d at 936-37. We agree with the Fourth District's conclusion. Security National did not gain standing to sue Stern for prior acts of legal malpractice by forming an attorney-client relationship with Stern during the appeal of the underlying foreclosure action. Therefore, we approve the Fourth District's conclusion on this issue. However, as explained below, we disagree with the Fourth District's extension of Kaplan into the context of general assignments of notes and mortgages.

STANDING BY ASSIGNMENT
We disapprove of the Fourth District's decision and conclude that Security National did not receive a valid assignment of the right to sue Stern for legal malpractice. First, in Kaplan, we did not adopt the minority, case-by-case approach regarding the assignment of legal malpractice claims. We continued to adhere to the majority view that legal malpractice claims are generally not assignable. Second, the Fourth District's reliance on Kaplan is *967 further misplaced because the facts in Stern are significantly different from those in Kaplan. Third, the relevant policy considerations in cases such as this weigh against recognizing the assignment of a legal malpractice claim in a general assignment of a note and mortgage. We address each of these reasons in order.
First, the Fourth District misinterpreted our holding in Kaplan as an abandonment of the majority view which generally prohibits legal malpractice assignments in favor of the minority, case-by-case approach, which permits all legal malpractice assignments that do not violate relevant policy principles. As we explained in Kaplan, "[a] majority of the states that have examined this issue, including Florida, have held that legal malpractice claims are generally not assignable. . . . A minority of jurisdictions allows assignment of legal malpractice claims[.]" 902 So.2d at 759 n. 3; see also KPMG, 765 So.2d at 38 ("[L]egal malpractice claims are not assignable because of the personal nature of legal services which involve a confidential, fiduciary relationship of the very highest character, with an undivided duty of loyalty owed to the client."); Forgione, 701 So.2d at 559 (quoting Washington v. Fireman's Fund Ins. Co., 459 So.2d 1148, 1149 (Fla. 4th DCA 1984) ("Florida law views legal malpractice as a personal tort which cannot be assigned because of `the personal nature of legal services which involve highly confidential relationships.'")). The Fourth District read Kaplan as follows:
The significance of Kaplan is not a narrow point pertaining to the attorney-client privilege, but rather the more broad view that the door is now open to assignment of legal malpractice actions in exceptional cases which do not fully implicate the core policy concerns underlying the general rule.
Stern, 916 So.2d at 938-39 (emphasis added). Contrary to the Fourth District's interpretation, the significance of Kaplan was indeed the narrow point pertaining to attorney-client privilege. Kaplan was not intended to proclaim that the door is now open to assignment of legal malpractice actions in exceptional cases.
Kaplan was the first and only case in which this Court permitted a limited exception to the general prohibition on legal malpractice assignments, and our holding was confined to the specific facts and circumstances of that case. Specifically, Kaplan involved the following facts:
Medical Research Industries, Inc. (MRI), a Florida corporation, developed and marketed homeopathic medical products. To raise money for capital improvements, MRI decided to issue a private placement of shares in the company. MRI's majority shareholder, William Tishman, consulted attorneys who prepared private placement memoranda. Through four private placements between 1996 and 1998, MRI raised over $50 million from about 2000 shareholders. Later, Tishman borrowed about $18 million in unsecured loans from MRI, leading to its eventual insolvency. MRI sued Tishman to recover the loan amount and obtained a judgment. Unable to satisfy the judgment, however, MRI executed an "Assignment for the Benefit of Creditors" to Donald Kaplan. Kaplan then sued for legal malpractice the attorneys who prepared the private placement memoranda. The trial court granted the attorneys' motions to dismiss, concluding that legal malpractice claims are personal and not assignable and are exempt from levy and sale under an execution of assignment.
902 So.2d at 757 (footnote omitted). The trial court dismissed the action, concluding that legal malpractice actions are not assignable. *968 On appeal, the Third District reversed, holding that the legal services at issue in Kaplan were not personal in nature but rather involved the publication of corporate information to third parties. Subsequently, we approved the Third District's holding and receded from "broad dicta" in Forgione and KPMG, which purported to prohibit the assignment of all legal malpractice claims. See Kaplan, 902 So.2d at 757; see also KPMG, 765 So.2d at 38; Forgione, 701 So.2d at 559. In reaching our conclusion, we compared lawyers preparing private placement memoranda to independent auditors (as in KPMG), and reasoned that both types of professionals owe professional duties to intended third parties who rely on the statements contained in their published documents. We permitted the assignment of the legal malpractice claim because the information prepared in Kaplan was intended for release to third parties, and, therefore, the assignment did not violate attorney-client confidentiality. However, we stressed that "the vast majority of legal malpractice claims remain unassignable because in most cases the lawyer's duty is to the client." Kaplan, 902 So.2d at 757 (emphasis added).
Thus, in Kaplan we reaffirmed our adherence to the majority view that most legal malpractice claims are nonassignable. In so doing, we necessarily rejected the minority, case-by-case approach of evaluating whether particular assignments violate public policy concerns. We do so again in this case.
Second, we also disapprove of the Fourth District's reliance on Kaplan because the factual circumstances in Stern are not analogous to those in Kaplan. In Kaplan, "[t]he attorneys owed a duty to the public when advising MRI and preparing the private placement memoranda." Kaplan, 902 So.2d at 761. We explained that attorneys preparing private (or public) placement memoranda "act not just for the corporation's benefit, but for the benefit of all those who rely on the representations in their documentsin this case, potential shareholders." Id. at 758 (emphasis added). Unlike the attorneys in Kaplan, Stern did not perform legal work for EMC with the intention of directly benefiting Security National or any other third party. Indeed, at the time Stern filed the untimely 1998 foreclosure action and voluntarily dismissed the timely 1997 foreclosure action, the duty Stern owed was solely to its client at the time, EMC.
Kaplan also differs from Stern in that the assignment of the legal malpractice claim in Kaplan was express, whereas Security National asserts an implied assignment of the legal malpractice claim through the general assignment of the note and mortgage. We find that the right to bring an action against Stern for legal malpractice is not one of the rights Security National acquired when it purchased the note and mortgage by general assignment. First, we note:
As a general rule, the assignee of a nonnegotiable instrument takes it with all the rights of the assignor, and subject to all the equities and defenses of the debtor connected with or growing out of the obligation that the obligor had against the assignor at the time of the assignment.
State v. Family Bank of Hallandale, 667 So.2d 257, 259 (Fla. 1st DCA 1995) (citing Dickerson, Inc. v. Federal Deposit Ins. Corp., 244 So.2d 748, 749 (Fla. 1st DCA 1971); Guaranty Mortgage & Ins. Co. v. Harris, 182 So.2d 450, 453 (Fla. 1st DCA), rev'd on other grounds, 193 So.2d 1 (Fla. 1966)); see also Rose v. Teitler, 736 So.2d 122 (Fla. 4th DCA 1999). Whereas the general assignment of a note and mortgage *969 conveys to the assignee the rights of the assignor under the note and mortgage (subject to the equities and defenses of the obligor), such an assignment does not implicitly assign the attorney-client relationship between the assignor and his attorney. As we have stressed before, "`the real basis and substance of the malpractice suit' is a breach of the duties within the personal relationship between the attorney and client." Forgione, 701 So.2d at 559 (emphasis added) (quoting Christison v. Jones, 83 Ill.App.3d 334, 39 Ill.Dec. 560, 405 N.E.2d 8, 10 (1980)).
In Stern, the legal malpractice claim arose from the personal attorney-client relationship established when EMC hired Stern to enforce its rights under the note and mortgage. This attorney-client relationship was not inherent in those instruments themselves. In other words, the right to sue for legal malpractice is not "connected with or growing out of" the relationship between the mortgagor and mortgagee; rather, the legal malpractice claim is connected to and grows out of the separately established relationship between the attorney and the client. See Family Bank of Hallandale, 667 So.2d at 259.
Third, we disapprove of the Fourth District's decision below because the relevant policy concerns weigh against permitting legal malpractice assignments. As we noted in Kaplan, the following passage from California's Second District Court of Appeal well explains the policies against legal malpractice assignments:
It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment. The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty. . . . The commercial aspect of assignability of . . . legal malpractice [actions] is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.
Kaplan, 902 So.2d at 760 (quoting Goodley v. Wank & Wank, Inc., 62 Cal.App.3d 389, 133 Cal.Rptr. 83, 87 (1976)). In essence, the two major policy concerns justifying a general prohibition against the assignment of legal malpractice claims are (1) protecting attorney-client confidences and (2) preventing a market for legal malpractice claims. The Fourth District determined that these policy concerns were not present in Stern.
As to the first policy concern, the Fourth District reasoned that "[t]he case . . . does not involve personal services. It also seems unlikely that EMC or North American shared privileged information *970 with Stern." See Stern, 916 So.2d at 938. Given the complete absence of any record support for this reasoning, it is rather speculative. We are unwilling to presume that Stern's relationships with EMC and North American did not involve personal services or that confidential information was not disclosed. Likewise, we also are unwilling to determine, as the Fourth District necessarily did, that EMC impliedly waived the attorney-client privilege when it conveyed the note and mortgage by general assignment. See id. at 938. Finding such an implied waiver in the general assignment of a note and mortgage would permit numerous unforeseen assignees downstream to have access to the original assignor's confidential information and would expose the assignor's attorney to virtually limitless liability to parties with whom the attorney never owed a professional duty. See Kaplan, 902 So.2d at 760 (citing Goodley, 133 Cal.Rptr. at 87).
We also disagree with the Fourth District's conclusion that permitting legal malpractice assignments in this context would not tend to create a marketplace for legal malpractice claims. To the contrary, this is precisely the type of transaction that our precedent warns against. See Kaplan, 902 So.2d at 760; KPMG, 765 So.2d at 38; Forgione, 701 So.2d at 559. Recognizing legal malpractice assignments under these circumstances would create an incentive for both holders of such impaired instruments and speculators to market these notes and mortgages with the right to sue the attorney in the failed foreclosure action included as a major factor in pricing the transaction. As stated earlier, this would expose attorneys to liability to parties who had no connection to the underlying foreclosure action, "never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty." Kaplan, 902 So.2d at 760 (quoting Goodley, 133 Cal.Rptr. at 87). Permitting such a market to arise would create an "undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client." Id. (quoting Goodley, 133 Cal.Rptr. at 87).
In short, the assignment of legal malpractice claims that arise in mortgage foreclosures violates the two policy concerns underlying the general prohibition against such assignment.

CONCLUSION
For the reasons expressed above, we quash the Fourth District's decision and hold that Security National does not have standing to bring an action against Stern for legal malpractice either through an attorney-client relationship or by general assignment.
It is so ordered.
WELLS, ANSTEAD, and CANTERO, JJ., concur.
LEWIS, C.J., concurs in result only with an opinion.
PARIENTE, J., dissents with an opinion, in which QUINCE, J., concurs.
QUINCE, J., dissents with an opinion, in which PARIENTE, J., concurs.
LEWIS, C.J., concurring in result only.
I respectfully disagree with the holding of the majority that the assignment of the legal malpractice claim in the instant matter was not permissible under our previous decision in Cowan Liebowitz & Latman, P.C. v. Kaplan, 902 So.2d 755 (Fla.2005). Although I dissented in Kaplan and disagree with the analysis it presents, it is *971 now the law of Florida. I am of the opinion that the Fourth District below correctly followed Kaplan and concluded that the assignment was permissible under the reasoning of this Court in Kaplan. See Sec. Nat'l Servicing Corp. v. Law Office of David J. Stern, P.A., 916 So.2d 934, 938 (Fla. 4th DCA 2006). Therefore, I concur in result only based on my continued belief, as expressed in my concurring in result only opinion in Kaplan, that the decision of this Court in Kaplan was overly broad and violated the long-standing principle in this State that legal malpractice claims are not assignable. See Kaplan, 902 So.2d at 762 (Lewis, J., concurring in result only) ("I cannot subscribe to the broad reasoning employed by the majority and its unnecessary reliance on broad concepts of general assignability that I believe to be inapplicable to the instant matter.").
Contrary to the assertions of the majority, the decision of this Court in Kaplan was not "confined to the specific facts and circumstances of that case." Majority op. at 967. Instead, the Kaplan decision established factors to be applied to permit the assignment of legal malpractice claims in situations where the legal services provided by the attorney are not personal in nature and therefore do not involve any confidential communications that would trigger the policy concern of protecting the attorney-client privilege, which generally justifies the prohibition against the assignment of legal malpractice claims. See Kaplan, 902 So.2d at 761 n. 4 (permitting the assignment of a legal malpractice claim where "[t]he claim[] . . . [does] not involve personal services or implicate . . . confidentiality concerns"). It is now too late for this Court to close the proverbial barn door by asserting that the Kaplan decision was limited only to the specific facts presented in that case without receding from that decision.
In the instant matter, as in Kaplan, the legal services provided were not personal in nature. See id. at 759. A mortgage foreclosure action requires only that the claimant be the owner and holder of the note and mortgage and that the mortgagee has defaulted on that note and mortgage. See Chemical Residential Mortgage v. Rector, 742 So.2d 300, 300 (Fla. 1st DCA 1998). In such actions, an attorney's duty is to the client only to the extent that the client is the owner and holder of the note and mortgage. The benefit or detriment of any actions taken by the attorney with regard to the foreclosure will clearly flow to any subsequent holders, and, accordingly, subsequent holders should be permitted to hold the attorney accountable for malpractice with regard to the foreclosure action if the Kaplan analytical factors are applied. Similar to the preparation of the private placement memoranda in Kaplan, an attorney filing a foreclosure action acts for the benefit of not only the present client, but also any subsequent holder of the mortgage and note, who will rely on the representations contained in those documents.
Additionally, upon application of the underlying principles of Kaplan, the policy concerns that generally militate against permitting the assignment of legal malpractice claims are not present in the instant matter. As noted above, a foreclosure action requires only the mortgage and note, as well as a determination of whether the mortgagee has defaulted. See Chemical, 742 So.2d at 300. There is absolutely no reason to believe or assume that an attorney undertaking such an action will obtain confidential information from a client that would be protected under the attorney-client privilege. The assertion of the majority that the Fourth District's position that no attorney-client privileged information with regard to the foreclosure action was shared with Stern during his *972 representation is "speculative," majority op. at 970, is simply not substantiated with any supporting evidence, nor is it supported by the reality of the information that is required to file a foreclosure action. Similarly, the majority's assertion that to permit the malpractice claim in the instant matter would create a marketplace for legal malpractice claims, see majority op. at 970, the other asserted policy concern against allowing such assignments, is also unsubstantiated by any reasoning or evidence. Even permitting the assignment in actions such as the instant matter, an attorney's duty in foreclosure actions would be far from unbounded because it would be limited to the present and any subsequent holders of the note and mortgage. The Kaplan factors are either valid or invalid and we should strive for stability.
Finally, the majority's attempt to distinguish the instant matter from Kaplan based on the fact that the assignment in Kaplan was express, whereas in the instant matter the assignment was implied, is a distinction without legal significance. In Florida, unless a writing is required by statute, an assignment can be implied. See 3A Fla. Jur.2d Assignments § 18 (2006). Florida also recognizes the right to freely assign common law and statutory rights unless such an assignment offends public policy concerns. See VOSR Indus., Inc. v. Martin Props., Inc., 919 So.2d 554, 556 (Fla. 4th DCA 2005). Contrary to the assertion of the majority that the assignment in the instant matter would have constituted an impermissible assignment of the attorney-client relationship, see majority op. at 969, allowing the assigned malpractice claim to proceed would not have implicated any attorney-client confidentiality concerns because the legal services in the instant matter were not personal in nature. Therefore, there were no public policy concerns that would prevent the assignment.
In conclusion, the Fourth District below correctly applied the factors established by this Court in Kaplan and determined that the assignment in the instant matter was permitted under the reasoning of our earlier decision there. The legal services in the instant matter were not personal in nature and did not implicate confidentiality concerns. However, I concur in result only based on my continued objection to the broad reasoning employed by the majority of this Court in Kaplan, which has opened the door to the assignment of legal malpractice claims in potentially countless other contexts. We should either recede from Kaplan or apply the underlying factors used to support the Kaplan decision.
PARIENTE, J., dissenting.
I agree with Justice Quince's dissent and would approve the well-reasoned decision of the Fourth District in this case. The Fourth District followed our decision in Cowan Liebowitz & Latman, P.C. v. Kaplan, 902 So.2d 755 (Fla.2005), in which we prohibited the assignment of most legal malpractice claims. Chief Justice Lewis correctly observes that the Fourth District's reasoning and ultimate result in this case is clearly permissible under our analysis in Kaplan because the claim is not personal in nature and none of the other public policy concerns that justify prohibiting the assignment of legal malpractice claims is present. See concurring in result only op. at 971. Although Chief Justice Lewis is correct that we opened the door in Kaplan, it is my view that this door was neither unwisely opened nor does it now need to be closed.
I would follow the sound reasoning of those jurisdictions that have allowed "the assignment of a claim for malpractice that is part of a general assignment in a commercial setting and transaction that encompasses *973 a panoply of other assigned rights, duties, and obligations." Cerberus Partners, L.P. v. Gadsby & Hannah, 728 A.2d 1057, 1060 (R.I.1999). As astutely observed by the Massachusetts Supreme Court, the policy reasons justifying a blanket prohibition against the assignment of legal malpractice claims are in part based "on outmoded concepts and protectionism," such as the fear of "open trading" of legal malpractice claims. N.H. Ins. Co. v. McCann, 429 Mass. 202, 707 N.E.2d 332, 337 (1999).
Further, as expressed by both of these courts, the attorney-client privilege is a non-issue given the commercial and transactional circumstances of these types of cases because the assignment operates as a waiver of any attorney-client privilege. See id.; Cerberus Partners, 728 A.2d at 1060. In fact, in rejecting the attorney-client privilege public policy concern as a basis for prohibiting the assignment of malpractice claims, the Supreme Court of Pennsylvania concluded: "We will not allow the concept of the attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice. Where the attorney has caused harm to his or her client, there is no relationship that remains to be protected." Hedlund Mfg. Co. v. Weiser, Stapler & Spivak, 517 Pa. 522, 539 A.2d 357, 359 (1988). I believe there is great wisdom in the analyses of these courts.
The facts of this case highlight why allowing the assignment of this type of legal malpractice claim violates no conceivable public policy. Here, the act of malpractice occurred in 1999 when attorney Stern voluntarily dismissed the timely 1997 foreclosure action, leaving only the untimely 1998 foreclosure action intact. At the time, EMC Mortgage Corporation held the mortgage. However, based on our decision in Perez-Abreu, Zamora & De La Fe, P.A. v. Taracido, 790 So.2d 1051 (Fla. 2001), EMC could not bring a legal malpractice claim at that time because the cause of action did not accrue "until the conclusion of the . . . underlying judicial proceeding." Id. at 1055. Thus, the legal malpractice cause of action in this case did not accrue until 2001, when the Second District affirmed the final judgment holding that the mortgage foreclosure case was barred by the statute of limitations. By then the mortgage had been assigned from EMC to Universal Portfolio Buyers, Inc., to North American Mortgage Company, and finally to Security National Servicing Corporation. Instead of working at cross purposes, all of these entities cooperated with Stern, the original lawyer who admitted to the legal malpractice, in an attempt to eliminate the harm caused by the malpractice through the litigation process.
Frankly, it would be difficult for an outside observer not to conclude that the per-petuation of a rule that prohibits the assignment of legal malpractice claims in this context serves only to protect a clearly negligent attorney at the expense of the mortgage holders, who were engaged in legitimate commercial transactions. For these reasons, I must respectfully dissent.
QUINCE, J., concurs.
QUINCE, J., dissenting.
I do not agree with the majority that the assignment of the legal malpractice claim in this case would violate policy concerns which underlie the general prohibition against the assignment of legal malpractice actions. Therefore, I would approve the decision of the Fourth District Court of Appeal, which followed our decision in Cowan Liebowitz & Latman, P.C. v. Kaplan, 902 So.2d 755 (Fla.2005). In Kaplan we allowed the assignment of a legal malpractice claim finding that "[t]he claim MRI *974 assigned to Kaplan does not involve personal services or implicate confidentiality concerns." Kaplan, 902 So.2d at 761. The same is true in this case. In addition, I do not believe that concerns about the development of a market for legal malpractice claims outweigh the rights of the parties in this claim to their access to the courts for redress.
I agree with the majority that Kaplan is not an abandonment of Florida's general prohibition against the assignment of legal malpractice claims. Instead, in Kaplan we said in no uncertain terms that "most" or the "vast majority" of legal malpractice claims continue to be unassignable. This Court in Kaplan cited the prior cases from this Court that have addressed the assignability issue. We noted that in Forgione v. Dennis Pirtle Agency, Inc., 701 So.2d 557 (Fla.1997), receded from on other grounds by Cowan Liebowitz & Latman, P.C. v. Kaplan, 902 So.2d 755, 757 (Fla.2005), a case that did not involve a legal malpractice issue, we said legal malpractice claims generally involve personal service and issues of confidentiality which preclude assignment. We reiterated the position in KPMG Peat Marwick v. National Union Fire Insurance Co., 765 So.2d 36 (Fla. 2000), receded from on other grounds by Cowan Liebowitz & Latman, P.C. v. Kaplan, 902 So.2d 755, 757 (Fla.2005), another case that did not involve a legal malpractice issue, that legal malpractice claims were generally not assignable because of the personal nature of the service rendered. With those principles in mind, we examined the nature of the services rendered by the lawyers in Kaplan and concluded that the services were more in the nature of the independent auditor that was examined in KPMG. Moreover, we examined the notion that the assignment of legal malpractice claims would result in the creation of a market for these claims that would not bode well for the legal profession. And while we continued to express our concerns in these policy areas, we nonetheless found that the claim in Kaplan, the legal malpractice claim, was assignable.
As in Kaplan, neither the nature of the services nor the policy concerns require the nonassignability of the legal malpractice claim involved in this case. The majority is unwilling to presume that the law firm's representation in this case did not involve personal services or the disclosure of confidential information. As the Fourth District pointed out, the underlying service in this case is a botched mortgage foreclosure. The plaintiff in the malpractice action, Security National, is the transferee of the note and mortgage that was the subject of the foreclosure action. The law office, on the other hand, represented all of the holders of the note and mortgage beginning with EMC Mortgage. EMC, after getting an assignment of the note, asked the law firm to foreclose the loan. While the action was pending, EMC assigned the loan to Universal Portfolio Buyers, who in turn assigned the loan to North American Mortgage Company. While an appeal from the grant of summary judgment in favor of the property owner was pending, North American assigned the loan to Security. The Law Office of David J. Stern, P.A. continued to represent each entity in this chain of assignments. It is Stern's seamless, uninterrupted representation of EMC, Universal, North American, and Security in this matter that demonstrates that this type of representation for a commercial transaction lacks the unique and personal duties that characterize the typical malpractice claim that might be imperiled if we allowed the general assignment of legal malpractice claims.
The very nature of the mortgage industry itself further demonstrates a lack of unique and personal duties that often characterize *975 confidential relationships. The sale of mortgage loans is a very common transaction in this country. Average homebuyers are aware that their mortgages are likely to be sold to a new mortgagee at any time. It is more likely than not that as a member of an industry in which selling mortgages is an everyday occurrence, EMC was aware that the same information given to its attorney in this foreclosure action would necessarily flow to any assignee purchasing the note and mortgage while the action was still pending.
If Stern, as attorney for a company in the business of acquiring then selling mortgage loans, was concerned about confidentiality, he could have advised his client, EMC Mortgage, or his subsequent client, Universal Portfolio Buyers, or his subsequent client, North American Mortgage, of their ability to not assign any potential malpractice claim if they opted to sell the mortgage. There would be no imperilment of the sanctity of the relationship between an attorney and a client when that client is advised that any information divulged to the attorney can readily be kept confidential if the client values confidentiality more than the ability to assign the claim. Kevin Pennell, Note, On the Assignment of Legal Malpractice Claims: A Contractual Solution to a Contractual Problem, 82 Tex. L.Rev. 481, 500 (2003).
As to our public policy concern that we want to prevent creating a market for legal malpractice claims, I agree with the Fourth District that these concerns are more apparent when the legal representation and assignment occur in a non-commercial setting. See Security Nat'l Serv. Corp. v. Law Office of David J. Stern, P.A., 916 So.2d 934, 937 (Fla. 4th DCA 2006) (quoting from Kaplan the California case of Goodley v. Wank & Wank, Inc., 62 Cal.App.3d 389, 133 Cal.Rptr. 83, 87 (1976)). In the instant case it is an important distinction that we do not have the mere purchase of a malpractice claim, we have a commercial assignment of the lender's original agreement. The malpractice claim was not transferred to economic bidders who have never had a professional relationship with Stern. The malpractice cause of action did not accrue until December 2001, by which time Stern had established a professional relationship with Security National; clearly he is not defending himself against strangers. Stern, 916 So.2d at 936.
I also do not believe that the assignment of the malpractice claim here would encourage an unjustified lawsuit against Stern or promote champerty,[1] two additional concerns noted by the majority. The record indicates that Stern botched this foreclosure and that National Security held the mortgage and note on the property when the judgment resulting from Stern's negligence became final. It was at this point that National Security was precluded from recovering on its note and mortgage. Id. This malpractice claim is thus meritorious and there is no encouragement of an unjustified lawsuit. It is not unjust to require Stern to compensate the holder of the mortgage that, because of his legal malpractice, is now unable to claim the property used to secure the mortgage.
Champerty requires a party unrelated to the lawsuit to form an agreement with a litigant in the suit to help pursue the litigant's claim in consideration for receiving part of the judgment. Black's Law Dictionary 246 (8th ed.2004). This is clearly not *976 the situation here. The origin of this policy concern was the Goodley court, which was deciding the case in 1976 based on a claim for malpractice arising out of a divorce proceeding. See Goodley 133 Cal. Rptr. 83. The Goodley court was rightly concerned in a situation where a legal malpractice action was bought and brought by a stranger to a divorce action. Thirty years after Goodley, we should not be deciding a case in which the parties are operating in a commercial setting with the assignment of a commercial instrument on the same principal considerations used in a very personal divorce setting.
The majority also believes that allowing the assignment under these circumstances would create an incentive for both holders of mortgages and speculators to include the right to sue an attorney in failed foreclosures as a factor increasing the marketability of the mortgage. This seems highly speculative, and as one commentator notes:
Legal malpractice claims are very suspect. Many more claims end in defeat rather [than] victory. Such claims are quite often vigorously contested. . . . [B]ecause a rational buyer-assignee of any such claim will expect a stiff fight at the courthouse, a stable, routine market for such claims is unlikely to develop.
Kevin Pennell, Note, On the Assignment of Legal Malpractice Claims: A Contractual Solution to a Contractual Problem, 82 Tex. L.Rev. 481, 495-96 (2003) (quoting Michael Sean Quinn, On the Assignment of Legal Malpractice Claims, 37 S. Tex. L.Rev. 1203, 1215-16 (1996)). Malpractice suits are an expensive and lengthy process, and the outcome is never certain. It is unlikely that sophisticated business entities will begin taking the extreme risk of purchasing mortgage notes solely to sue attorneys for malpractice. Narrowing our holding to allow claims to be brought only by assignees that have retained the attorney in question to represent them in the same matter further ensures that the majority's fear of a market for such claims will never be realized.
I would affirm the lower court's ruling and hold that pursuant to a commercial assignment, the assignee holding a commercial instrument at the time a cause of action accrues owns a legal malpractice claim if the attorney committing the alleged malpractice was retained by that current assignee in the same matter.
PARIENTE, J., concurs.
NOTES
[1] Defined in Merriam-Webster's Collegiate Dictionary (10th ed.) as "a proceeding by which a person not a party in a suit bargains to aid in or carry on its prosecution or defense in consideration of a share of the matter in suit."